WESTERMAN BALL EDERER MILLER
  ZUCKER & SHARFSTEIN, LLP
1201 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 622-9200
Philip J. Campisi, Jr., Esq.
John E. Westerman, Esq.
Mickee M. Hennessy, Esq.
*Counsel To Amalgamated Bank, As Trustee*
*Of Longview Ultra Construction Loan Investment Fund*


UNITED STATED BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

| | |
|---|---|
| In re:<br><br>EAST END DEVELOPMENT, LLC,<br><br>       Debtor. | Chapter 11<br>Case No. 12-76181-REG |

------------------------------------------------------------------x

| | |
|---|---|
| POST-EFFECTIVE DATE COMMITTEE OF THE<br>ESTATE OF EAST END DEVELOPMENT, LLC,<br><br>       Plaintiff,<br><br>    -against-<br><br>AMALGAMATED BANK, as Trustee of<br>Longview Ultra Construction Loan Investment<br>Fund f/k/a Longview Ultra I Construction Loan<br>Investment Fund,<br><br>       Defendant. | Adv. Pro. No. 13-08081-REG |

------------------------------------------------------------------x


**DEFENDANT AMALGAMATED BANK'S TRIAL MEMORANDUM**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

LEGAL ARGUMENT ........................................................................................................... 15

    I.    AMALGAMATED IS ENTITLED TO JUDGMENT DENYING EACH OF
        PLAINTIFF'S CLAIMS AS A MATTER OF LAW & ON THE MERITS. ................... 15

        A.  Amalgamated Is Entitled to Judgment Denying Plaintiff's First Claim for Relief --
              Breach Of Contract. ............................................................................................ 15

            a.  Undisputed Evidence Demonstrates that Amalgamated did not breach the Loan
                 Documents, Term Sheet, or the Building Loan Agreement ("BLA") ........................ 15

            b.  There was no enforceable oral modification to the Loan Documents. ...................... 19

            c.  Amalgamated's conduct or course of dealing did not constitute a waiver of its
               rights. ............................................................................................................... 23

        B.  Amalgamated Is Entitled to Judgment Denying Plaintiff's Second Claim for Relief --
              Breach Of Implied Covenant Of Good Faith And Fair Dealing .................................... 24

        C.  Amalgamated Is Entitled To Judgment Denying Plaintiff's the Third Claim for Relief -
              "Lender Liability" ............................................................................................... 26

        D.  Plaintiff's Quasi-Contract Claim for Unjust Enrichment Is Barred By The
              Existence Of A Governing Contract. ...................................................................... 29

        E.  Amalgamated Is Also Entitled To A Judgment Denying Plaintiff's
              Declaratory Relief Claim. .................................................................................... 32

        F.  Waste And Diminution Of Value Of Property Is Not A Recognized Claim, Is
              Duplicative, And Also Fails Based On the Undisputed Evidence. .............................. 33

        G.  The Objection To Claim Cannot Stand As The Only Claim In An Adversary
              Proceeding ......................................................................................................... 34

    II.   EACH OF PLAINTIFF'S CLAIMS IS BARRED BY THE DOCTRINE
        OF *IN PARI DELICTO* AND THE *WAGONER* DEFENSE. .......................................... 35

CONCLUSION .................................................................................................................... 38

# <u>TABLE OF AUTHORITIES</u>

*Ainbinder v. Money Center Fin. Group*,
    No. CV 10-5270(SJF)(AKT), 2013 WL 1335997, *8 (E.D.N.Y. Feb. 28, 2013) ................... 30

*Anostario v. Vicinanzo*,
    59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 410 (1983) ................................................. 20

*Bankruptcy Services, Inc. v Ernst & Young* (*In re CBI Holding Co.*),
    529 F.3d 432, 447 (2d Cir.2008) ............................................................................. 36

*Barbagallo v. Marcum LLP*,
    820 F. Supp.2d 429, 443 (E.D.N.Y. 2011) .............................................................. 30

*Barker v. Time Warner Cable, Inc.*,
    83 A.D.3d 750, 752, 923 N.Y.S.2d 118, 120 (2d Dep't 2011) ................................. 25

*CAMOFI Master LDC v. Coll. P'ship, Inc.*,
    452 F.Supp.2d 462, 280-81 (S.D.N.Y. 2006) ......................................................... 33

*Carlin v. Jemal*,
    68 A.D.3d 655, 891 N.Y.S.2d 391 (1st Dep't 2009) ............................................... 22

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
    90 F. Supp.2d 401, 418 (S.D.N.Y. 2000) .............................................................. 26

*Chiste v. Hotels.com L.P.*,
    756 F.Supp.2d 382, 407 (S.D.N.Y. 2010) .............................................................. 33

*Cossoff v. Rodman* (*In re W.R. Grant Co.*),
    699 F.2d 599, 610 (2d Cir. 1983) .......................................................................... 26

*Deer Park Enterprises, LLC v. Ail Sys., Inc.*,
    57 A.D.3d 711, 712, 870 N.Y.S.2d 89, 90 (2d Dep't 2008) ..................................... 25

*Euojy Realty Corp. v. Van Wagner Comm., LLC*,
    22 N.Y.3d 413, 425, 4 N.E.3d 336, 344 (2013) ...................................................... 20

*Fisser v. International Bank*,
    282 F.2d 231, 238 (2d Cir. 1960) .......................................................................... 26

*Food Holdings Ltd. v. Bank of America Corp.* (*In re Parmalat Sec. Litig.*),
    477 F.Supp.2d 602, 693 (S.D.N.Y.2007) .............................................................. 36

*Fox v. Lummus Co.*,
    524 F.Supp. 27, 30 (S.D.N.Y. 1981) ..................................................................... 29

*Gaia House Mezz LLC v. West Sky, LLC*,
   720 F.23d 84, 91 (2d Cir. 2013)........................................................................ 23

*Gaia House Mezz LLC v. West Sky, LLC*,
   720 F.3d 84, 94n.5 (2d Cir. 2013)..................................................................... 26

*HSH Nordbank AG New York Branch v. St.*,
   421 F. App'x 70 (2d Cir. 2011) ......................................................................... 17

*HSH Nordbank Ag New York Branch v. Swerdlow*,
   672 F. Supp. 2d 409, 419 (S.D.N.Y. 2009)....................................................... 17

*Labajo v. Best Buy Stores, L.P.*,
   478 F.Supp.2d 523, 530 (S.D.N.Y.2007) .......................................................... 32

*LaGuardia Associates v. Holiday Hospitality Franchising, Inc.*,
   92 F. Supp. 2d 119, 128 (E.D.N.Y. 2000) ......................................................... 19

*LaSala v. Bank of Cyprus Public Co. Ltd.*,
   510 F.Supp.2d 246, 278 (S.D.N.Y. 2007) ......................................................... 36

*Lowenthal v. Baltimore & Ohio R.R. Co.*,
   247 A.D. 144, 157, 287 N.Y.S. 62, 76 (1st Dep't 1936) ................................... 26

*Merrill Lynch Interfunding, Inc. v. Argenti*,
   155 F.3d 113, 122 (2d Cir. 1998)....................................................................... 20

*Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC*,
   93 N.Y.2d 229, 236, 711 N.E.2d 953, 957 (1999)............................................. 22

*Nat'l Westminister Bank USA v. Vannier Group*,
   160 A.D.2d 348, 348-49, 554 N.Y.S.2d 482, 484 (1st Dep't 1990) .................. 23

*Nat'l Westminster Bank USA v. Century Healthcare Corp.*,
   885 F. Supp. 601, 602 (S.D.N.Y. 1995)............................................................. 27

*Official Committee of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*,
   277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999)................................................. 28

*Orchard Hotel, LLC v. D.A.B. Grp., LLC*, 106 A.D.3d 628, 629, 966 N.Y.S.2d 395, 397 (1st Dept. 2013) ......................................................................................... 16

*Pinter v. Dahl*,
   486 U.S. 622, 632 (1988)................................................................................... 36

*re Northeast Indus. Dev. Corp.*,
   513 B.R. 825, 842 (S.D.N.Y. 2014).................................................................. 20

iii

*re Teltronics Servs., Inc.*,
   29 B.R. 139, 170 (Bankr E.D.N.Y. 1983) ............................................................................ 27

*Ross v. Bolton*,
   904 F.2d 819, 824 (2d Cir.1990) ......................................................................................... 36

*Shearson Lehman Hutton, Inc. v. Wagoner*,
   944 F.2d 114, 120 (2d Cir.1991) ......................................................................................... 36

*Southern Federal Savings and Loan Assoc. of Georgia v. 21-26 East 105th Street Assoc.*,
   145 B.R. 375, 380-81 (S.D.N.Y. 1991) ............................................................................... 22

*Strojmaterialintorg v. Russian American Commercial Corp.*,
   815 F.Supp. 103, 106 (E.D.N.Y. 1993) .............................................................................. 30

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
   894 F.2d 516, 522 (2d Cir. 1990) ........................................................................................ 20

*Viable Marketing Corp. v. Intermark Communications, Inc.*,
   No. 09-CV-1500(JS)(WDW), 2011 WL 3841417, at *3 (E.D.N.Y. Aug. 26, 2011) .............. 30

*Village on Canon v. Bankers Trust Co.*,
   920 F.Supp. 520, 525 (S.D.N.Y. 1996) ............................................................................... 19

*Wechsler v. Hunt Health Systems, Ltd.*,
   186 F.Supp.2d 402, 412 (S.D.N.Y. 2002) ........................................................................... 20

## PRELIMINARY STATEMENT

Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Investment Fund ("Amalgamated" or "Lender"), by its undersigned counsel, submits this Trial Memorandum in response to all claims asserted in the Adversary Complaint filed by the Post-Effective Date Committee of the Estate of East End Development, LLC (the "Post-Effective Committee" or the "Plaintiff"[1]) in this proceeding (ECF Docket No. 139; the "Complaint").

At its heart and stripped of the incendiary and inaccurate allegations in the Complaint and moving papers, this is a straightforward case. A construction loan went bad. The Debtor was the Borrower on the loan and defaulted by, among other things, failing to complete the Project and pay off the loan by maturity and failing to meet the conditions for an extension of the maturity date. Contrary to the allegations now made years later that Amalgamated for some reason would "fabricate" a default, Amalgamated made every attempt over and above its legal obligations to enter into an acceptable arrangement with the Debtor (then the Borrower) and to complete and bring the Project to market.[2] <u>Amalgamated, of course, would have no motive not to do so</u>.

Plaintiff is using this adversary proceeding to recover money from Amalgamated that four individual Mechanic's Lienors (out of approximately 28 lienors) have thus far been unsuccessful in receiving directly from the Debtor. Thus, although the Plaintiff has asserted seven (7) claims against Amalgamated in the Complaint, purportedly on behalf of the Debtor,

---

[1] The Plaintiff Committee consists of four (4) subcontractors with claims against the Debtor's estate who allegedly supplied labor, services or materials to the Project but who were not fully paid by the Debtor. They have asserted pending state court causes of action against Amalgamated (the "Mechanic's Lienors") arguing that their mechanic's liens prime Amalgamated's first lien position and therefore are entitled to 100% of its claim amount from the Mechanic's Lien Reserve Account. All other claims against Debtor's estate were resolved under the Debtor's Chapter 11 Plan.

[2] As the Court is likely aware from prior submissions, although notices of default were sent in July 2009, Amalgamated entered into protracted workout negotiations with the Debtor and did not commence a foreclosure action in the Suffolk County Supreme Court until August 2011.

1

under theories of breach of contract, quasi-contract, lender liability and other theories, the Complaint and prior pleadings make clear that this adversary proceeding really concerns claims the Mechanic's Lienors believe they have against, *not on behalf of,* the Debtor, and/or that should have been asserted in state court.

Amalgamated submits that all of the claims can and should be resolved in Amalgamated's favor based on the law as well as the undisputed facts and documentary evidence which will be presented at trial demonstrating that Amalgamated acted in accordance with its rights and obligations under the applicable loan documents. In fact, Plaintiff's own allegations in the Complaint and the evidence elicited during the case demonstrate that the Debtor not only defaulted under the loan documents, but also admittedly misappropriated monies funded by Amalgamated that were earmarked for subcontractors (*i.e.*, the Mechanic's Lienors) and others. For example, Plaintiff alleges the following misconduct by Debtor (itself here):

> "Prior to entering into the Loan Agreements, Amalgamated conducted minimal due diligence with respect to the Debtor and its experience in the area of real estate developments." *See* A.P. Docket No. 1, Complaint at ¶¶ 33-38.

> "From the beginning of the relationship between the Debtor and Amalgamated, Amalgamated turned a blind eye toward the improprieties of the Debtor's Principals." *Id.* at ¶ 103.

> "Once construction of the Sag Harbor Project began in earnest, Amalgamated continued to overlook the improper actions taken by the Debtor, through its principals, which actions violated the terms of the Loan Agreements as well as New York Lien Law." *Id.* at ¶ 125.

> "Meanwhile, although aware of the shortages, Amalgamated did not advise the plaintiffs [i.e., the Mechanic's Lienors], or any other entity performing work on the Sag Harbor Project, of the shortages or that they should stop working." *Id,* at ¶¶ 116-21.

On May 30, 2013, Plaintiff commenced an adversary proceeding against Debtor's principals, Emil Talel and Michael Maidan (Case No. 8-13-08076) (the "Insider's Action") which is presently pending.  In the Insider's Action, Plaintiff also made numerous allegations relating to the conduct of the Debtor (itself here), including:

> "[F]rom the inception of its loans, the Debtor and its principals took money from the Debtor and diverted it to other resources". *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> The "Debtor created cash flow shortages and cause its general contractor to miss payments to the Mechanic's Lienors".  *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> "[T]he Debtor and its principals remained silent and caused and actually directed the Mechanics Lienors to continue working."  *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> "but for the conduct of [Defendants Emil Talel, Michael Maiden, MM Sag Harbor LLC, Estate End Ventures LLC, 108-110 Duane Street Corp., and 108-110 Duane, LLC], the Mechanic Lienors would have been paid in full."  *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

As a result, Plaintiff's claims -- in addition to lacking factual and legal merit individually – are also barred in total by the doctrine of *in pari delicto.*

## FACTUAL BACKGROUND

Debtor was from on or about March 16, 2007 until 2013 the owner of the real property located at 21 West Water Street, Sag Harbor, New York (the "Sag Harbor Property").

The Debtor is comprised of two members, each holding 50% interests in the Debtor: MM Sag Harbor LLC ("MM Sag"), and 21 West.  MM Sag is the managing member of the Debtor. MM Sag is comprised of two members, each holding 50% interests in the company: Emil Talel ("Talel") and Michael Maidan ("Maidan").

Amalgamated is a majority union-owned bank with approximately twenty-seven retail branches throughout the United States.  Debtor received loans from Amalgamated in connection

with the purchase and proposed development of certain residential condominiums (the "Sag Harbor Project") on the Sag Harbor Property.

Talel and Maidan also own East End Ventures, LLC ("EEV"), and are the only two members of EEV, each holding 50% interests. EEV is the owner of the real property known as, and located at, 5 Ferry Road, Route 114, Sag Harbor, New York (the "Ferry Road Property"), and was formed for the purpose of developing the Ferry Road Property (the "Ferry Road Project"). EEV obtained financing for the Ferry Road Project from Amalgamated which financing was secured to the Ferry Road Property.

On or about March 16, 2007, 21 West conveyed the Sag Harbor Property to the Debtor (the "Closing") for a total purchase price of $7,200,000.00 (the "Purchase Price"). On or about March 16, 2007, the Debtor and Amalgamated entered into a Senior Loan Agreement in the amount of $3,600,000.00, a Building Loan Agreement in the amount of $16,347,825.00 (the "BLA"), (Exhibit "A") and a Project Loan Agreement in the amount of $8,052,175.00 (Exhibit "B") (collectively, the "Loan Agreements"), which loans were secured by first position mortgages on the Sag Harbor Property, evidenced by certain notes executed and delivered by the Debtor to Amalgamated, and personally guaranteed by Talel and Maidan. Collectively, Amalgamated agreed to lend the Debtor up to the aggregate sum of $28,000,000.00 (the "Total Commitment").

The BLA provides that to the extent that there is any conflict between the BLA and the term of any of the other loan documents, the terms of the BLA control.

The BLA provides for a Maturity Date (as defined therein) of April 1, 2009.

4

The BLA at Section 4.1.21 provides a completion date for the Sag Harbor Project of April 1, 2009 (the "Completion Date").

Neither the BLA nor any of the other Loan Agreements provides for any automatic or other right of the Debtor to an extension of the Maturity Date.  Instead, the BLA provides that Debtor may apply for a first extension period of three months and thereafter a second extension period of an additional three months but only if several conditions are satisfied, including, but not limited to:  (a) providing written notice of such extension by not later than 120 days nor earlier than 30 days prior to the Maturity Date; (b) that no Event of Default shall have occurred or be continuing at the time of or any time after the delivery of the extension notice; (c) that Borrower shall pay an extension fee equal to ¼ of 1% of the outstanding principal balance of the amount of the Loan at the time of each extension request; (d) the Debtor shall pay all other costs and expenses incurred by Amalgamated in connection with such extension, including underwriting, title and reasonable legal fees and costs; and (e) *that the completion of the Sag Harbor Project shall have occurred*.

Neither the BLA nor any of the other Loan Documents provides for any automatic or other right to an extension of the Completion Date.

Section 9.7 of the BLA provides that the BLA could not be modified or waived orally, but only by written agreement signed by Amalgamated.  Similarly, BLA Section 10.4 also provides that all modifications, amendments or waiver of any of the BLA's terms or any term of any other Loan Documents shall be an in a signed writing.

On or about March 16, 2007, the closing of the sale of the Sag Harbor Property from 21 West to the Debtor, and closing of the Loan Agreements, took place (the "Closing").

According to the Closing Statement (Exhibit "C"), the "Closing Draw" totaled $2,531,970.51 (the "Closing Draw").  $1,250,000.00 of the Closing Draw was a partial payment made to the Debtor of a $1,950,000.00 developer's fee it had negotiated with Amalgamated, which was duly provided for as a "soft cost" in the Project budgets, and was paid.  The principals of the Debtor, Emil Talel and Michael Maidan, agreed prior to the issuance of the loan that Amalgamated would apply this amount to the interest reserve the Ferry Road Loan (the "Ferry Road Payment"), which was a competing project that at the time was tied up with permitting issues with the Village of Sag Harbor and had become behind in reserves.  With developer's consent, Amalgamated did so.

The Closing Draw was further reduced from $1,281,970.51 to $1,078,599.02, which amount was disbursed to the Debtor by payment of $539,299.51 to Talel and $539,299.51 to Maidan as reimbursements for expenses enumerated on the Closing Statement, including permit and approval fees, hiring of architects and engineers, and other out-of-pocket expenses associated with the Sag Harbor Project.  Debtor and Debtor's principals, Talel and Maiden, all attest that these expenses reimbursed were actually spent and are true and accurate.

On or about July 2, 2007, Amalgamated entered into a contract with Construction Management Systems, Inc. ("CMS") for CMS to act as an independent consulting engineer on behalf of Amalgamated with respect to the Sag Harbor Project. CMS was generally responsible for reviewing plans, specifications, and budgets, and for making periodic on-site visits to the Sag Harbor Project in order to assess the status of the work completed, issue a Construction Progress Report, and make a recommendation as to whether any pending requisitions for payment were accurate.

On or about November 1, 2007, construction at the Sag Harbor Project started. Construction of the Sag Harbor Project was to take place in two Phases – Phase I would cover all construction under the ground and up to the slab, and Phase II would cover the remainder of the construction.

On or about January 1, 2008, the Debtor and RLW4 Construction, Inc. ("RLW4") entered into a contract under which RLW4 would act as general contractor with respect to Phase I of the Sag Harbor Project.

Over the course of construction of the Sag Harbor Project, RLW4 entered into subcontracts with numerous parties for the provision of work, labor, services, and materials (the "Subcontractors"), including, but not limited to, the real plaintiffs in interest here: All Systems Maintenance, Inc. ("All Systems") on or about February 22, 2008, Husbands for Hire d/b/a All Floors and Interiors, Inc. ("Husbands") on or about March 27, 2008 and November 26, 2008, JPR2, Inc. ("JPR2") on or about November 4, 2008, and Inter-Country Mechanical Corp. ("Inter-County") on or about May 13, 2009.

Pursuant to the Loan Agreements, the Debtor was required to submit requisitions for any payment to contractors and subcontractors for work done in connection with the construction of the Project as it progressed (the "Requisitions"). RLW4 prepared the Requisitions on behalf of the Debtor utilizing, among other things, invoices and requisitions submitted by the Subcontractors. Debtor also hired an individual named Mark D'Andrea as its consultant to generally monitor the Project, make on-site visits to the Project, and review on Debtor's behalf all requisitions prior to submission to CMS and Amalgamated. Each Requisition prepared by RLW4 would be reviewed by Mr. D'Andrea for accuracy. Thereafter, each Requisition was

7

submitted to CMS for review. CMS would review the Requisition with RLW4, discuss any issues and make any required changes.  When this process was completed, CMS would issue a Construction Progress Report to Amalgamated and certify whether it believed the Requisition to be accurate.  The Requisition would then be sent to Amalgamated to review and ultimately pay.

As an independent consultant, CMS had no approval rights nor any authority to modify in any way the terms of the BLA or other Loan Documents between Amalgamated and Debtor. The scope of CMS' services was simply to report on the progress of the construction and make recommendations as to the accuracy of the requisitions to be submitted to Amalgamated for consideration and funding.

Once a Requisition received final approval from Amalgamated, it would transfer the amount requested in the Requisition to the Debtor.  The Debtor was then required to transfer the approved funds to RLW4.

Between approximately January 14, 2008 and July 7, 2009, CMS completed nineteen (19) on-site visits to the Sag Harbor Project and submitted nineteen (19) Construction Progress Reports to Amalgamated.  Amalgamated accepted and fully funded to Debtor each of the Requisitions submitted by CMS prior to and even after Events of Default occurred.  A copy of Exhibit E to Debtor's Third Disclosure Statement evidencing the same is annexed as Exhibit "D".

At all times, the Completion and Maturity Date of April 1, 2009 established in the BLA were not modified or amended in any way.  Notably, Plaintiff has not been able to produce any writing indicating otherwise – because none exists.

As noted above, Section 9.7 of the BLA provided that the BLA could not be modified or waived orally, but only by a written agreement signed by Amalgamated.  BLA Section 10.4 also provides that all modifications, amendments or waiver of the BLA's terms or the term of any other Loan Document shall be in a signed writing.

As noted, the BLA provides for a Maturity Date of April 1, 2009.  The BLA at Section 4.1.21 provides a Completion Date of April 1, 2009.  Neither the BLA nor any of the other Loan Agreements provides for any automatic or other right of the Debtor to an extension of the Maturity Date.  Instead, the BLA provides that Debtor may apply for a first extension period of three months and thereafter a second extension period of an additional three months but only if it meets several conditions, including, but not limited to:

(a) providing written notice of such extension by not later than 120 days nor earlier than 30 days prior to the Maturity Date;

(b) *that no Event of Default shall have occurred or be continuing at the time of or any time after the delivery of the extension notice*;

(c) *that Borrower shall pay an extension fee equal to ¼ of 1% of the outstanding principal balance of the amount of the Loan at the time of each extension request*;

(d) that Borrower shall pay all other costs and expenses incurred by Amalgamated in connection with such extension, including underwriting, title and reasonable legal fees and costs; and

(e) *that the completion of the Sag Harbor Project shall have occurred.*[3]

BLA at Section 2.1.5 (emphasis supplied).   Neither the BLA nor any of the other Loan Documents provides for any automatic or other right to an extension of the Completion Date.[4]

---

[3] The Court will hear a testimony at trial of the contemplation of two potential extensions of the payment Maturity Date if all conditions were met was to provide additional time for the sell-out of the units provided that the construction was complete in accordance with the terms of the BLA.

[4] Section 9.7 of the BLA provides that the BLA could not be modified or waived orally, but only by written agreement signed by Amalgamated.  Similarly, BLA Section 10.4 also provides that all modifications, amendments or waiver of any of the BLA's terms or any term of any other Loan Documents shall be an in a signed writing.

On February 28, 2009, the Debtor submitted a written request to the Defendant for a three month extension of the Maturity Date to July 1, 2009.  Following the extension request submitted by Emil Talel on behalf of Debtor on or about February 28, 2009, Amalgamated attempted in accordance with its normal procedures to obtain financial statements from Talel and Maidan.  The requested financial statements were not delivered by either Talel or Maiden.

On or about April 8, 2009, after the April 1, 2009 Maturity Date, Talel sent a letter to Amalgamated indicating that he had not been able to provide a financial statement because of purported health reasons.

Debtor also did not meet several of the conditions to receive an extension of the Maturity Date, including, but not limited to, payment of the extension fee and, more importantly, the timely completion of the construction of Sag Harbor Project by April 1, 2009.

No written or other acceptance of the extension request of the Maturity Date or the Completion Date was ever issued by Amalgamated to the Debtor or any other person.[5]

In accordance with its rights under the BLA, Amalgamated funded certain requisitions following the expiration of the April 1, 2009 Maturity Date and Completion Date.  Amalgamated did so following these defined Events of Default without waiving its right to demand payment of the Building Loan Note, without becoming liable to make any or other further advances, and without effecting the validity on forcibility of the Building Loan Documents.  *See* BLA Section 9.2.

---

[5] Plaintiff's counsel is in possession of Debtor's files from its counsel Samuel Israel.  Notably, Plaintiff has not produced any documents indicating that any extension was granted and/or that an extension fee was paid or any of the other extension conditions (including completion of construction of the Project) met.

In June 2009, the interest reserve on the loan became depleted.  Debtor, however, failed to pay the interest as required.

On July 27, 2009, Amalgamated by its counsel issued a written letter to counsel for Debtor indicating that independent Events of Default had occurred, including (i) failure to complete the construction pursuant to the terms and within the time frame set forth in the BLA, (ii) failure to repay all outstanding principal together with other amounts due to Amalgamated under the Loan by the Maturity Date, and (iii) failure to remove Mechanic's Liens filed against Sag Harbor Property by RLW4 Construction and A&F Fire Protection Co., Inc.  A copy of the notice is annexed as Exhibit "E".

On July 28, 2009, counsel for Amalgamated sent to counsel for Debtor a pre-negotiation letter expressly reserving Amalgamated's rights while attempting to negotiate a workout and/or modification of the Loan with Debtor to allow for a potential completion of the Sag Harbor Project by Debtor.  Debtor signed the pre-negotiation letter which acknowledges Amalgamated's contention that the Debtor was in default under the BLA and that, among other things, Amalgamated reserved all its rights under the BLA and Loan Documents with respect to the defaults, including the right to cease funding at any time.  A copy of the pre-negotiation letter is annexed as Exhibit "F".

On July 29, 2009, Amalgamated issued a Notice of Default to the Debtor alleging two events of default: (a) the Debtor failed to repay the outstanding principal balance on the Maturity Date; and (b) the Debtor failed to timely complete construction of the Sag Harbor Project.  A copy of the Default Notice is annexed as Exhibit "G".

On July 30, 2009, Amalgamated issued an additional Notice of Default citing violations of Section 11.10 of the BLA.  A copy of the second Notice of Default is annexed as Exhibit "H".

On August 3, 2009, Amalgamated approved and funded a Draw Request which was comprised of RLW4's combined draw request no. 9, totaling $1,135,005.09, and soft costs totaling, $3,553.17, for a total of $1,138,558.27 which was wired to the Debtor.  A copy of the wire approval is annexed as Exhibit "I".

On or about August 5, 2009, RLW4 prepared another Draw Request seeking payment for work completed and materials provided during July 2009. As a result of required changes over, among other things, a certain line item relating to a pool, the draw request was amended and not fully executed until September 11, 2009 (the "Last Requisition").

The Last Requisition sought payment of $1,551,894.09.

According to RLW4 and the Mechanic's Lienors (and the Complaint in this action and also the Complaint in the Insider's Action), Debtor did not contemporaneously advise RLW4 or advise the Subcontractors that Amalgamated had issued a Notice of Default and had ceased funding the Sag Harbor Project.

By letter dated August 21, 2009 and addressed to Rick Markisoto, the principal of Jen-Mark Associates, Inc. and successor consultant to CMS, RLW4 advised Mr. Markisoto of the background of the Sag Harbor Project and advised that, under the revised schedule, with all trades back to work, his opinion was that the project will be substantially completed by November 20, 2009 and within budget.  Mr. Markisoto disagreed and concluded that (a) the cost

to complete the Sag Harbor Project was greater than the remaining Total Commitment of Loan Funds, and (b) the anticipated Completion Date was not realistic.

On or about September 11, 2009, the Last Requisition was submitted to Amalgamated. In accordance with its rights under the BLA, Amalgamated did not fund the Last Requisition.

Negotiations between Amalgamated and Debtor in connection with any potential working modification of the Loan took place over an extended period of time but ultimately failed.[6]

As a result, Amalgamated commenced a foreclosure action against the Debtor on August 18, 2011, in the Supreme Court of the State of New York, County of Suffolk, in an action titled *Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Investment Fund v. East End Development, LLC et al.*, Index No. 32574/11 (the "Foreclosure Action").

Debtor answered the Complaint in the Foreclosure Action and asserted counterclaims against Amalgamated which, although frivolous, were typical of a defaulted borrower. These counterclaims were essentially lifted almost entirely by counsel for the Mechanic's Lienors and asserted as the basis for the claims in the Complaint in this proceeding. A copy of this answer is annexed as Exhibit "J".

On October 12, 2012, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. As of the October 12, 2012 petition date, in addition to the Foreclosure Action, a lien foreclosure action commenced by A&F Fire Protection Co. Inc. in the Supreme Court of the State of New York, County of Suffolk, Index No. 42600/2009 and other

---

[6] Contrary to the deposition testimony of Emil Talel which plaintiff is offering to the Court in lieu of live testimony at trial, Amalgamated will demonstrate that the meeting at Amalgamated's offices attended by Talel and his counsel, Bernard Jaffe, which Talel testified took place in the spring of 2009 and at which he was supposedly granted an extension actually took place on September 10, 2009.

consolidated Mechanic's Lienor foreclosure actions (collectively, the "State Court Action"), were pending against the Debtor, Amalgamated and certain other parties.  In the State Court Action, the Mechanic's Lienors (and other Subcontractors not parties to this proceeding) assert that their Mechanic's Liens should have priority over the first position mortgages of Amalgamated with respect to the Sag Harbor Property.

Pursuant to a Stipulation and Order entered by this Court in the Debtor's case on January 28, 2013 [Docket No. 78], the automatic stay provisions of the Bankruptcy Code were modified to the extent necessary "(i) to permit the State Court Action to proceed, including without limitation any claims, cross-claims, counter-claims or appeals by B&G or any other parties named therein; and (ii) to permit Mechanic's Lien Claimants whose Mechanic's Lien Cases or any appeals thereof were pending as of the Petition Date to continue their pending Mechanic's Lien cases, up to a determination by the applicable state court where the Mechanic's Lien Case is pending, including any pending appeal and any other appeal related thereto or in connection therewith".  A copy of this Stipulation and Order is annexed as Exhibit "K".

On September 27, 2013, the Court confirmed the Debtor's Plan (Exhibit "L").  In accordance with Section 9.2 of the Plan, Amalgamated deposited 100% of the principal amount of the Mechanic's Liens with the Disbursing Agent into a Mechanic's Lien Claims Reserve Account, to be available to the Mechanic's Lien Claimants if they prevail in demonstrating priority over Amalgamated in the State Court Action.  The Mechanic's Lien Claimants has little, if any, activity in connection with the State Court Action.

In accordance with the Plan, the Sag Harbor Property was thoroughly marketed and, thereafter an auction occurred. Amalgamated was the successful (and only) bidder at the auction sale, as subsequently approved by the Court.

Since taking back the Sag Harbor Property, Amalgamated hired third party professionals in an effort to complete the Project and, to the extent possible, salvage recovery of the monies it loaned and paid-out in connection with the Project, which amount will likely exceed $40 million. During the nearly five year delay in the completion of the Project resulting from Debtor's default and continued litigation, other condominium properties have "beaten" the Project to market in Sag Harbor, which increased the projected cost to complete the project because of required design upgrades.

## LEGAL ARGUMENT

### I.     AMALGAMATED IS ENTITLED TO JUDGMENT DENYING EACH OF PLAINTIFF'S CLAIMS AS A MATTER OF LAW & ON THE MERITS.

#### A.    Amalgamated Is Entitled to Judgment Denying Plaintiff's First Claim for Relief -- Breach Of Contract.

##### a.    Undisputed Evidence Demonstrates that Amalgamated did not breach the Loan Documents, Term Sheet, or the Building Loan Agreement ("BLA")

Plaintiff's breach of contract claim is premised on its allegation that Amalgamated breached the Loan Documents, Term Sheet, and the BLA by "failing to fund the Unpaid Commitment, failing to fund approved Requisitions timely, and alleging defaults by the Debtor which defaults had not occurred, or were precipitated by Amalgamated's default." Complaint, ¶ 228. However, the BLA[7], which was agreed to by and between Amalgamated and the Debtor,

---

[7] Plaintiff during the action has referred to other documents including the Term Sheet executed by the Debtor and Amalgamated. However, even assuming any of these documents have any bearing on Amalgamated's obligations to fund construction advances, pursuant to the express terms of the BLA, the BLA controls to the extent there is any conflict between that agreement and the terms of any of the other Building Loan Documents, which term means, in

and the undisputed material facts demonstrate that these allegations are unsupportable.

First, although Plaintiff alleges without basis otherwise, it is undeniable that the Debtor was in default of its obligations as of July 29, 2009 when Amalgamated issued its Notice of Default.  Amalgamated issued its Notice of Default based on (a) the Debtor's failure to timely repay its debt to the Amalgamated by the defined Maturity Date of April 1, 2009, and (b) complete construction of the Improvements by that same date in accordance with Section 4.1.21 of the BLA.  The Debtor had not fulfilled either of these obligations as of July 29, 2009 when the Notice of Default was issued.  And each of these failures by the Debtor constituted an Event of Default under Section 9.1 of the BLA thereby relieving Amalgamated of any obligation to make further advances pursuant to Section 9.2 of the BLA, *See* BLA, § 9.1(a)(i), (a)(xvi); § 9.2(d).[8]

In short, Amalgamated was well within its rights when it issued the Notice of Default to the Debtor on July 29, 2009 and as of that time had no further obligation to make advances to the Debtor, even assuming, as Plaintiff falsely alleges, the Project was 92% complete as of such time.[9]  Complaint, ¶ 140.  *See, e.g., Orchard Hotel, LLC v. D.A.B. Grp., LLC*, 106 A.D.3d 628, 629, 966 N.Y.S.2d 395, 397 (1st Dept. 2013) ("As a consequence of [borrower's] default under the note at maturity, [Lender] was not obligated to make any more advances under the Building Loan Agreement. Indeed, it was entitled to cease making any advances, without advising

---

essence, any other document concerning the rights or obligations of either Amalgamated, the Debtor or guarantors with respect to the Building Loan.  *See* BLA, § 10.20, 1.1 (defining the term "Building Loan Documents").  In sum, there can be no breach of the Term Sheet.

[8] While Amalgamated did not issue its Notice of Default until July 27, 2009, its obligation to make further advances terminated much earlier – at the time Debtor defaulted on its obligations.  See BLA, § 7.1 ("***Upon the occurrence of an Event of Default***, Agent may declare Lenders' obligations to make Advances hereunder to be terminated…"). (emphasis added).  And, pursuant to the express terms of the loan documents, plaintiff cannot argue that Amalgamated forfeited its right to declare the default due to any purported delay in issuing the Notice of Default.  See BLA, § 9.6 ("***Borrower hereby waives*** to the extent not prohibited by applicable law (a) all . . . notices of nonperformance (except to the extent required by the provisions hereof or of any other Building Loan Documents) . . ., (b) *any requirement of diligence or promptness on Agent's or Lenders' part in the enforcement of its rights (but not fulfillment of its obligations) under the provisions of this Agreement or any other Building Loan Document*, and (c) any and all notices of every kind and description . . . ") (emphasis added).

[9] It was not, as the evidence at trial will demonstrate.  In fact, the Project has only just been completed.

[borrower] that [borrower] was in default."); *HSH Nordbank Ag New York Branch v. Swerdlow*, 672 F. Supp. 2d 409, 419 (S.D.N.Y. 2009) *aff'd sub nom. HSH Nordbank AG New York Branch v. St.*, 421 F. App'x 70 (2d Cir. 2011) ("[Lender] merely exercised its express contractual right to discontinue funding advances after the December 14, 2007 Funding Deadline. '[E]xercising contract rights to protect an investment does not constitute bad faith.'") (internal citations omitted).

Second, notwithstanding Plaintiff's allegations, the evidence demonstrates that Amalgamated in fact paid the Debtor timely and in full for each of the requisitions submitted prior to July 29, 2009 and therefore was not in breach of its obligation to make advances to the Debtor as of the time it declared a default.  This is evident from the Debtor's own written representations to this Court in Exhibit E to its Third Amended Disclosure Statement dated May 8, 2013 (the "Disclosure Statement") and by the documents produced in discovery demonstrating that Amalgamated's funding matched the approved draw requisition amounts submitted to Amalgamated prior to the Loan being called into default on July 29, 2009.  The Debtor's Disclosure Statement lists the date and amount paid for each of those requisitions.  There can be no serious argument that by August 3, 2009, each one of the requisitions received had been paid by Amalgamated.

Moreover, Amalgamated did not waive these rights by choosing to fund advances after April 1, 2009 – when the Debtor was due to repay the debt and complete its construction obligations under Section 4.121 (and or even after July 29, 2009, when it notified the Debtor of the defaults).  This is clear from the BLA, which contained a 'No Waiver' provision that expressly permitted Amalgamated to choose to "make Advances or parts of Advances thereafter [the Event of Default] **without thereby waiving the right to demand payment of the Building**

17

**Loan Note, without becoming liable to make any other or further Advances, and without affecting the validity of or enforceability of the Building Loan Documents**." *See* BLA, § 9.2 (emphasis added).  Similarly, Section 9.7 of the BLA provides in relevant part that:

> *No course of dealing and no delay or omission by Agent, Lenders or Borrower in exercising any right or remedy hereunder shall operate as a waiver thereof or of any other right or remedy* . . . . *The making of an Advance hereunder during the existence of an Event of Default shall not constitute a waiver thereof*. . . . No Advance of Building Loan proceeds hereunder, . . . shall constitute . . . a waiver of any of the conditions of Lenders' obligation to make further Advances, nor in the event Borrower is unable to satisfy any such condition, shall any such failure to insist upon strict compliance have the effect of precluding Lenders from thereafter refusing to make an Advance and/or declaring such inability to be an Event of Default as hereinabove provided.  *All Advances shall be deemed to have been made pursuant hereto and not in contravention of the terms of this Agreement.*

BLA, § 9.7 (emphasis added).  Plaintiff's allegations that Amalgamated breached the Building Loan Agreement by calling a default or by thereafter failing to continue to provide funds to the Debtor up to the amount stated as the "Total Commitment" are flatly contracted by the express rights granted to Amalgamated under the BLA.

Faced with indisputable evidence that there were several Debtor Events of Default under the loan agreement and that Amalgamated noticed Debtor's default, funded and ceased funding the loan in conformance with the terms of the loan agreements, Plaintiff essentially argues that Amalgamated should not have put the loan in default because the term was extended by Amalgamated orally and/or because by funding the loan after the maturity date, Amalgamated waived its right to call a default.   These allegations are absurd and are belied by the BLA's 'No Modification' clause, which bars oral modifications to the loan agreement and by its 'No Waiver' provision, which provides that no course of dealing, or delay in the exercise of its rights or election to fund after default shall operate as a waiver of Amalgamated's rights or remedies.

Plaintiff seeks to have the Court disregard these provisions, but such 'No Modification' and 'No Waiver' provisions are customary in loan agreements and are routinely enforced. *See Village on Canon* v. *Bankers Trust Co*., 920 F.Supp. 520, 525 (S.D.N.Y. 1996).

b.  <u>There was no enforceable oral modification to the Loan Documents.</u>

Plaintiff alleges that no default had occurred because the parties amended the BLA orally and extended the loan's maturity and completion dates.  However, the express terms of the BLA preclude this argument.  Within the BLA, Amalgamated and Debtor repeatedly agreed that the BLA could not be modified or waived orally, but only by a written agreement signed by Amalgamated. *See* BLA, § 9.7 ("No waiver or consent shall be binding upon Lender unless it is in writing and signed by Agent."); BLA, § 10.4 (providing that all modification, amendments, or waivers of its terms or the term of any other Loan Documents shall be in a signed writing). **There is no such written modification here.**

Pursuant to New York statutory law, in the face of such a written agreement requiring that all changes to the contract must be in writing, Plaintiff's allegations of a purported oral modification are not enforceable. *See* N.Y. Gen. Oblig. Law § 15-301 ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement <u>unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent</u>.") (emphasis added); *LaGuardia Associates v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 128 (E.D.N.Y. 2000)("When a written contract provides that it can only be changed by a signed writing, an oral modification of that agreement ... is not enforceable.").  There are two exceptions to the no oral modification rule – partial performance and equitable estoppel.  Contrary to Plaintiff's previously expressed argument, it has not alleged (and cannot allege) that

19

the parties' conduct falls within the "partial performance" exception to this statutory rule.[10]

"For partial performance to overcome § 15-301, *that partial performance must be 'unequivocally referable' to the new contract*. . ." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (emphasis added).  To find that the partial performance be 'unequivocally referable' to the allegedly modified contract requires that the action taken be "unintelligible or at least extraordinary, explainable *only* with reference to the oral agreement" *Argenti*, 155 F.3d at 122 (emphasis added) (quoting *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 410 (1983)).  This is a "stringent standard" (*Wechsler v. Hunt Health Systems, Ltd.*, 186 F.Supp.2d 402, 412 (S.D.N.Y. 2002)), that is satisfied only when the conduct proven "is inconsistent with any other explanation."  (*In re Northeast Indus. Dev. Corp.*, 513 B.R. 825, 842 (S.D.N.Y. 2014) (internal quotations omitted), report and recommendation adopted by, No. 14-cv-7056 (NSR), 2015 WL 3776390 (Jun. 16, 2015)).  "Where the possibility of other reasons for the conduct exists, the performance is equivocal" – in other words, it does not meet this stringent standard.  *In re Northeast Indus. Dev. Corp.*, 513 B.R. at 842 (internal quotations omitted).

In earlier motion practice, plaintiff argued that Amalgamated's conduct – continuing to fund the Project after default and standing by as Debtor allowed work to proceed is "unequivocally referable" to a loan modification that extended the maturity date.  However, this argument fails because conduct that is wholly compatible with the obligations, terms or

---

[10] Plaintiff cannot rely on the second exception either, which applies "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). Under that exception "the conduct claimed to have been performed in reliance on the oral modification *must be unequivocally referable to the modification*. Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, *conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written.*" *Id.* (emphasis added); *see also Euojy Realty Corp. v. Van Wagner Comm., LLC*, 22 N.Y.3d 413, 425, 4 N.E.3d 336, 344 (2013) (same).  As analyzed herein, plaintiff cannot prove that any of its actions (or even Amalgamated's actions) were "unequivocally referable" to the modification therefore, this second exception does not apply either.

conditions of the written loan agreement is not considered unequivocally referable to an oral modification. *See Village on Canon* v. *Bankers Trust Co.*, 920 F.Supp. 520, 527 (S.D.N.Y. 1996). In *Canon*, the loan agreement also prohibited oral modifications to the agreement. The borrower, Village on Canon ("VOC"), nevertheless alleged that there was an oral agreement to extend the maturity of the loan. VOC argued that its payment and Banker's Trust's acceptance of interest payments after maturity constituted partial performance of this oral modification to extend. The court rejected this argument, finding that making payments while trying to avoid foreclosure was consistent with the terms of the loan agreement and so too was accepting these payments after default/maturity. The court also noted that the loan agreement contained a 'no waiver' provision that expressly contemplated that acceptance would not constitute a waiver of Banker's Trust's rights. Finally, the court held that the payment and acceptance of interest payments did not give rise to an estoppel exception to the 'No Modification' provision. Like VOC, Plaintiff's arguments on oral modification must fail because Amalgamated's conduct – providing funds after default and engaging in discussions about a work out were consistent with the terms of its loan agreements, which also contain 'no waiver' provisions.

Many other courts in this Circuit have ruled the same in similar debtor/creditor cases. For example, the U.S. Court of Appeals for the Second Circuit has expressly held that a lender's failure to immediately object to the debtor's failure to satisfy conditions of the loan, the lender's act of making an advance not otherwise due under the contract, and the borrower's investment of $1 million into the project, amongst other alleged evidence, was insufficient -- as a matter of law – to show partial performance of a purported oral modification. *Towers*, 894 F.2d at 522. Similarly, the Bankruptcy Court for the Southern District of New York concluded that a bank's forbearance in exercising its rights under contract and, at times, paying amounts owed through

advancements under the loan did not evidence "partial performance" of a modified agreement to continue to make further advances "as necessary to keep the loan current, to avoid default and to permit construction . . ." *See Southern Federal Savings and Loan Assoc. of Georgia v. 21-26 East 105th Street Assoc.*, 145 B.R. 375, 380-81 (S.D.N.Y. 1991); *see also Carlin v. Jemal*, 68 A.D.3d 655, 891 N.Y.S.2d 391 (1st Dep't 2009) (rejecting claim that maturity date on loan was orally modified because "[n]either defendants' failure to pay on the due date nor plaintiff's apparent failure to demand immediate payment constitutes partial performance, because neither is unequivocally referable to the alleged oral modifications, as there may have been other explanations for such decisions.").

Moreover, plaintiff erroneously relies on Amalgamated's purported conduct to support an alleged partial performance exception; yet, this exception cannot be applied unless **the Debtor's conduct** is "unequivocally referable" to any alleged modification or extension.   *See, e.g.*, *Eujoy Realty Corp.*, 22 N.Y.3d at 426, 4 N.E.3d at 344 (internal quotations omitted) (emphasis added)("When the parties dispute whether an oral agreement has been formed, **it is the conduct of the party advocating for the oral agreement that is determinative**, although the conduct of both parties may be relevant.") (emphasis added); *see also Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC*, 93 N.Y.2d 229, 236, 711 N.E.2d 953, 957 (1999) ("Under our jurisprudence, it is the conduct of the entity seeking to enforce the oral agreement, and its detrimental reliance on the agreement, that makes proper the invocation of equitable principles.").

Focusing on the Debtor's conduct further demonstrates that the partial performance exception does not apply.  Again, courts have expressly and repeatedly a held that conduct consistent with a borrower's performance under the loan documents or general operation of its

business does not evidence a "partial performance" unequivocally referable to a modified contract.  *See, e.g., Towers*, 894 F.2d at 522 (noting that "nothing in the written agreements precluded" the borrower from making such expenditures in furtherance of the project); *In re Northeast Indus. Dev. Corp.*, 513 B.R. at 842 (debtor's acts – completing construction of the project and making efforts to find a tenant for the building – "are completely consistent with the Debtor's existing obligations under the Note and Mortgage even without the existence of the Loan Workout Agreement."); *see also Nat'l Westminister Bank USA v. Vannier Group*, 160 A.D.2d 348, 348-49, 554 N.Y.S.2d 482, 484 (1st Dep't 1990) (rejecting argument that the debtor's continuation of its business operations evidenced a "partial performance" of an agreement not to seek repayment of the loans until some future date).  As a New York appellate court has explained, "there are possible explanations for [a debtor's] decision to stay in business other than the alleged oral assurances . . . including, perhaps, a belief that [the bank] would be disinclined to call the notes if [the borrower] showed progress in turning their business around" and perhaps a hope that the lender "would understand the mutual advantages to be gained by an extension."  *Nat'l Westminister Bank*, 160 A.D.2d at 348-49, 554 N.Y.S.2d at 484.

       c.   Amalgamated's conduct or course of dealing did not constitute a waiver of its rights.

Plaintiff also argues that by not immediately calling a default at maturity, funding the loan after maturity and engaging in work out discussions with Debtor, Amalgamated waived its rights to call the default and cease funding the loan.  This argument is contrary to the 'No Waiver provision' expressly stated in the BLA and is wholly without merit.  As the Second Circuit Court of Appeals reasoned, a course of dealing can only establish a waiver if, among other things, the course of dealing is <u>inconsistent</u> with the terms of the parties' agreement. *Gaia House Mezz LLC v. West Sky, LLC*, 720 F.3d 84, 91 (2d Cir. 2013).  However, when – as here -- the parties'

contract expressly provides that a failure to strictly enforce the agreement shall not constitute a waiver; such a failure to strictly enforce the terms of the contract cannot be deemed inconsistent with the contract. *Gaia House Mezz*, 720 F.3d at 91 (Emphasizing that the lender's "course of performance, including its disregard of particular contractual obligations on [debtor's] part from time to time, was ***consistent*** with the Agreement". *Id.* (emphasis added). Consequently, ***"the Agreement remains enforceable***" because its terms were never waived. *Id.* (emphasis added). These are exactly the circumstances here and therefore, no waiver has occurred.

Lastly, Plaintiff's allegations of an oral modification and/or waiver are unavailing in any event. Plaintiff argues that the Debtor and Amalgamated had extended the maturity date, and the Debtor's deadline to comply with its construction obligations under Section 4.1.21, to June 30, 2009.  The evidence will demonstrate that not only is this allegation false, ***but also that the Debtor had not fulfilled those obligations as of June 30, 2009 in any event***.  In other words, even if such modification and/or waivers had occurred, Plaintiff was nonetheless in default under the loan documents when the Notice of Default was issued.

Accordingly, Plaintiff' breach of contract claim cannot stand and Amalgamated is entitled to judgment denying the First Claim for Relief.

### B. Amalgamated Is Entitled to Judgment Denying Plaintiff's Second Claim for Relief -- Breach Of Implied Covenant Of Good Faith And Fair Dealing

The crux of Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is its allegation that "Amalgamated deprived the Debtor of the benefit of its bargain with Amalgamated when Amalgamated, among other things, failed to fund the Unpaid Commitment, thereby preventing completion of the Sag Harbor Project, failed to fund approved Requisitions timely thereby causing work slow-downs and stoppages, and alleged defaults by the Debtor which defaults had not occurred, or were precipitated by Amalgamated's default."  Complaint, ¶

236.  This is the *very same misconduct* that Plaintiff alleged support its claim for breach of contract.  For that reason alone, pursuant to New York law this implied covenant claim must be dismissed.

A claim for breach of the implied covenant of good faith and fair dealing cannot be maintained when the claim is simply a reiteration of a breach of contract claim and/or when it is premised on conduct that is consistent with a party's rights and duties under a loan agreement.  *See Village on Canon* v. *Bankers Trust Co.*, 920 F.Supp. 520 (S.D.N.Y. 1996) (dismissing claim because borrower's claim was duplicative of breach claim and because conduct borrower claimed constituted a breach was permitted by the terms of the loan agreement).  As the Appellate Division, Second Department explained: "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract'."  *Deer Park Enterprises, LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712, 870 N.Y.S.2d 89, 90 (2d Dep't 2008) (internal quotations omitted).  Where the breach of contract and implied covenant claim are thus duplicative, the implied covenant claim is fatally flawed and accordingly, is routinely disposed of on a motion to dismiss.  *See, e.g.*, *Deer Park Enterprises*, 57 A.D.3d at 712, 870 N.Y.S.2d at 90 (modifying order to dismiss claim); *Barker v. Time Warner Cable, Inc.*, 83 A.D.3d 750, 752, 923 N.Y.S.2d 118, 120 (2d Dep't 2011) (affirming dismissal of the implied covenant claim).

Moreover, this claim fails for two additional reasons.  First, the allegations underlying this claim were analyzed in the breach of contract section above and were shown to be in conflict with rights expressly granted to Amalgamated under the BLA.  The implied covenant of good faith and fair dealing cannot be used to infer rights or obligations that are directly contradicted

(and/or governed) by the parties' agreement. *See, e.g.*, *Gaia House Mezz LLC v. West Sky, LLC*, 720 F.3d 84, 94n.5 (2d Cir. 2013). Second, and again as analyzed in the breach of contract section above, these allegations were also shown to be demonstrably false.

In short, the implied covenant claim fails as a matter of law and as a matter of fact. Accordingly, Amalgamated is entitled to judgment denying this claim.

### C. <u>Amalgamated Is Entitled To Judgment Denying Plaintiff's the Third Claim for Relief - "Lender Liability"</u>

The Plaintiff's purported "claim" for lender liability fails for several reasons.

Initially, it must be noted that "lender liability is not an independent cause of action, but a term that refers to the imposition of traditional contract or tort liability on a bank or other financial institution." *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 90 F. Supp.2d 401, 418 (S.D.N.Y. 2000). Plaintiff's "claim" for lender liability thus fails first because there is no such claim.

Moreover, even assuming that Plaintiff actually argues that this doctrine makes Amalgamated responsible for some misconduct by the Debtor, this "claim" still fails because liability may only be imposed on the lender -- due to the breach of contract or tortious conduct of another person -- when the plaintiff can establish that the requirements of alter ego or "instrumentality" doctrine have been met – which Plaintiff cannot satisfy. *See Lowenthal v. Baltimore & Ohio R.R. Co.*, 247 A.D. 144, 157, 287 N.Y.S. 62, 76 (1st Dep't 1936), *aff'd* 272 N.Y. 360, 6 N.E.2d 56 (1936); *Fisser v. International Bank*, 282 F.2d 231, 238 (2d Cir. 1960).

Courts generally have been reluctant to impute control of the borrower to a lender that acts in good faith simply to safeguard its interests. *See, e.g., Cossoff v. Rodman (In re W.R. Grant Co.)*, 699 F.2d 599, 610 (2d Cir. 1983) (noting that it is permissible for Lender's to use leverage to "recoup the most amount of money possible" and to closely monitor a borrower

without being found to be controlling the borrower), *cert. denied*, 464 U.S. 822 (1983).  Several

courts have explained that lender's should be given a fair amount of latitude to protect their own

interests as creditors.    *Id.* ("There is generally no objection to a creditor's [sic.] using his

bargaining position... to improve the status of his existing claims."). Only in *rare* circumstances

can a lender be found to improperly dominate its borrower. *In re Teltronics Servs., Inc.*, 29 B.R.

139, 170 (Bankr E.D.N.Y. 1983)).

> Lender liability is predicated on an unmistakable showing that the
> subservient corporation in reality has no separate, independent
> existence of its own and was being used to further the purposes of
> the dominant corporation. Suggestions by a major lender for a
> defaulted debtor, even when coupled with a threat of the exercise
> of its legal rights if the debtor does not comply, are both
> commonplace and completely proper.

*Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 602

(S.D.N.Y. 1995).   Indeed, "[a] lender is not obligated to sit idly by and watch its financial

security erode." *Id.* A lender can "monitor the debtors' financial situation, make suggestions

intended to improve it and take actions short of undue entanglement with the borrower's

operations. There is nothing inherently wrong with a creditor carefully monitoring its debtor's

financial condition or suggesting courses of action the debtor ought to follow to improve its

financial condition." *Id.*

The undisputed facts show that: (1) the lender did not exercise the requisite "control"

over the Debtor within the meaning of this doctrine; (2) the Debtor did not commit "fraud or

worse", during the period of time it was allegedly controlled by the lender; and (3) the Debtor's

misconduct that Plaintiff complains of was not the proximate cause of any losses to the Debtor's

estate.

First, Plaintiff cannot show that the lender exercised unlawful control over the Debtor.[11] Amalgamated never obtained any ownership interest in the Debtor or even installed any of its own officers of employees as managers or members of the Debtor.  Nor is there any merit to Plaintiff's contentions that the lender's ability to pick and choose which expenses it would fund is evidence of lender's control over the Debtor.  *Compare* Complaint, ¶¶ 149-50.  Indeed, <u>how can the Mechanic's Lienors even make the claim that the Debtor has been an alter-ego of the Amalgamated since July 2009 when Amalgamated was forced to institute a mortgage foreclosure lawsuit against Debtor in the New York State Supreme Court for the County of Suffolk two years later in the year 2011?</u>  In short, there is no proof that the Amalgamated exercised unlawful control over the Debtor and Amalgamated is entitled to judgment on this "claim" for that reason alone.[12]

Second, even assuming that Plaintiff could prove the requisite amount of control, Plaintiff does not allege and cannot connect how Amalgamated caused the Debtor to perpetrate any "violation of a statutory or other positive duty, or a dishonest and unjust act in contravention of [the Debtor's estate's] legal rights."  In this action, Plaintiff has argued that Amalgamated caused the Debtor to violate its duties to the Mechanics Lienors under New York Lien Law.  This is evidently a reference to Plaintiff's allegations that the Debtor (the supposed real plaintiff here) did not apply all the payments it received from Amalgamated towards the expenses for this

---

[11] Notwithstanding any allegations contained within its Complaint, Plaintiff has disclaimed any intention to base its Amalgamated liability "claim" on the Debtor's conduct prior to July 2009 – the date when Amalgamated somehow allegedly breached the contract by sending a default letter to the Debtor.  *See* Dkt. Entry No. 10, at p. 23.  Plaintiff argues that its Lender liability "claim" is based on actions occurring after Amalgamated issued the July 2009 default letter. *Id.*

[12] The legal authorities Plaintiff previously cited in support of its Lender liability claim further demonstrate that the Amalgamated did not "control" the Debtor under the relevant standard.  *See* Dkt Entry No. 10, at p. 5 (*quoting Official Committee of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999) ("[C]ourts require a strong showing that the creditor assumed actual participatory and total control of the debtor….Merely taking an active part in the management of the debtor corporation does not automatically constitute control….Suggestions by a major Lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper.")

Project.  Complaint, ¶¶ 68, 103, 121.  Yet, even assuming these allegations are true they are unavailing because these events did not occur during the period Plaintiff claims Amalgamated allegedly controlled the Debtor – that is after July 2009.

Lastly, the only alleged misconduct of the Debtor that occurred after July 2009 consists of Plaintiff's complaints that Amalgamated caused the Debtor "to shirk its fiduciary duties as debtor-in-possession during administration of this bankruptcy case." But as detailed above, all proceedings in the bankruptcy proceeding were on notice, often challenged by the Mechanic's Lienors, the Debtor's plan in the case was made in good faith and confirmed by the Court.

Accordingly, Amalgamated is entitled to judgment dismissing the lender liability "claim."

### D.  **Plaintiff's Quasi-Contract Claim for Unjust Enrichment Is Barred By The Existence Of A Governing Contract.**

Plaintiff's claim for unjust enrichment is based upon its unsupportable allegations that Amalgamated improperly cut off the Debtor's funding then selectively chose which of the Debtor's expenses to fund, and refused to continue to fully fund the Project after the default, thereby permitting the project to "sit dormant" and "deteriorate in value."  *See* Complaint, ¶¶ 251-59.

Amalgamated is entitled to judgment on this claim because Amalgamated's rights and obligations to the Debtor and the Project are governed by an express contract, namely the BLA and other Loan Documents.  Unjust enrichment is a quasi-contract claim that "**only applies in the absence of an express agreement**." *Barker*, 83 A.D.3d at 752, 923 N.Y.S.2d at 121 (emphasis added); *see also Fox v. Lummus Co.*, 524 F.Supp. 27, 30 (S.D.N.Y. 1981) (Unjust enrichment "is an obligation created by law only in the absence of an agreement between the parties.") (emphasis added).

In other words, "**the existence of an express contract between the plaintiff and defendants governing the particular subject matter of its claim for unjust enrichment precludes the plaintiff from maintaining a cause of action sounding in quasi-contract against defendants**." *Strojmaterialintorg v. Russian American Commercial Corp.*, 815 F.Supp. 103, 106 (E.D.N.Y. 1993) (internal alterations and quotations omitted); *see also Ainbinder v. Money Center Fin. Group,* No. CV 10-5270(SJF)(AKT), 2013 WL 1335997, *8 (E.D.N.Y. Feb. 28, 2013) (Unjust enrichment claim "fails, because there is an express contract governing the matter."); *Viable Marketing Corp. v. Intermark Communications, Inc.*, No. 09-CV-1500(JS)(WDW), 2011 WL 3841417, at *3 (E.D.N.Y. Aug. 26, 2011).  This legal principle is so well understood and so easily applied that courts routinely dismiss unjust enrichment claims pursuant to motions to dismiss when the subject matter of the claim is covered by a written agreement between the parties.  *Barbagallo v. Marcum LLP*, 820 F. Supp.2d 429, 443 (E.D.N.Y. 2011) (dismissing claim); *Fox*, 524 F.Supp. at 30 (same).

Here, the Plaintiff has not only attempted to assert a breach of contract claim, but have also alleged the purported defaults under these contracts as the very predicate for its unjust enrichment claim.  *See* Complaint, ¶¶ 252-253.  There is no dispute that a valid and enforceable contract exists, namely the BLA and other Loan Documents. [13]  Nor can there be any dispute that Amalgamated's rights and responsibilities to the Debtor are governed by the terms of those agreements. Accordingly, Plaintiff's unjust enrichment claim fails as a matter of law.

Plaintiff's claim also fails as a matter of fact because the undisputed material facts show that this claim is baseless.  As analyzed above, the Debtor had defaulted under the BLA Loan Documents as of April 1, 2009 for several independent reasons and the Loan Documents

---

[13] On the breach of contract claim, the parties only dispute whether the Debtor and/or Amalgamated breached its terms and whether or not the written terms of the BLA, for example, were modified or amended.  This is not the same as disputing whether a valid and enforceable contract (however constituted) exists.

permitted Amalgamated to stop funding altogether or to make additional advances without waiving its rights and remedies as a result of the default. This is just what Amalgamated did here. Plaintiff argues that, in equity, Amalgamated is at the very least liable to pay the Mechanic's Lienors the amounts withheld from advances prior to the default as "retainage".[14] However, again such an equitable claim is barred by the Loan Documents for two reasons.

First, as noted above, the BLA expressly provides that, after <u>the occurrence</u> an Event of Default, Amalgamated has no further duty to advance any funds. *See* BLA, § 9.2(d).

Second, this equitable argument is also barred by Section 2.1.10(a) of the BLA, which specifically explains the purpose of "retainage" and provides that the Amalgamated can keep such amounts in circumstances such as those existing here. In relevant part, Section 2.1.10(a) of the BLA states "[i]t is further understood that the Retainage described above is intended to provide a contingency fund protecting Amalgamated against failure of Borrower or Guarantor to fulfill any Obligations under the Building Loan Documents, and that Amalgamated may charge amounts against such Retainage in the event Amalgamated is required or elects to expend funds to cure any Default or Event of Default." *See* BLA, § 2.1.10(a). Therefore, Plaintiff's allegations that Amalgamated was unjustly enriched (by keeping the retainage or otherwise) are not only governed by the Loan Documents, they are also directly contrary to rights the Amalgamated had under the Loan Documents, to which the Debtor and Amalgamated both agreed.[15]

Finally, to the extent Plaintiff alleges that Amalgamated's actions *post-default* form the basis of a viable unjust enrichment claim – this also fails. "To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the

---

[14] ??

[15] In fact, the evidence will demonstrate Amalgamated has spent millions of dollars completing the Project.

enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Labajo v. Best Buy Stores, L.P.*, 478 F.Supp.2d 523, 530 (S.D.N.Y.2007) (citation omitted).  First, Plaintiff has failed to provide any information concerning the manner in which Amalgamated was reportedly enriched.  To the extent that it intends to rely on Amalgamated's actions to preserve the value of the property and mitigate its potentially crushing losses, as described above, Amalgamated was entitled to take such actions.  Second, Plaintiff has completely failed to support its conclusory statements that Amalgamated's actions post-default were in anyway at the Debtor's expense.  Indeed, any and all efforts by Amalgamated to preserve the value of the property were inarguably to the benefit of the Debtor.  Lastly, there can be no argument that Amalgamated's exercise of its contractual rights to protect an investment does not constitute circumstances such that equity and good conscience require Amalgamated to make restitution to Debtor.

In summary, this claim is nothing more than a disguised claim made on behalf of the Mechanic's Lienors (and not the Debtor) which should have been brought and maintained in state court and could have been brought and maintained in state court based upon the provisions of the Confirmed Plan.  Respectfully, there is no basis for this Court to be hearing these claims.

Accordingly, based on the undisputed facts, Amalgamated is also entitled to judgment denying this claim.

### E.  Amalgamated Is Also Entitled To A Judgment Denying Plaintiff's Declaratory Relief Claim.

This Court should refuse to award any declaratory relief because the issues upon which Plaintiff seeks a declaration are the same issues that will be adjudicated on Plaintiff's breach of contract claim.

Here, Plaintiff seeks a declaration that the Debtor was not in default under the Loan

Documents and that, by declaring a default, Amalgamated breached "the Loan Documents, the Term Sheet, and the BLA . . . ." Complaint, ¶ 266. This request is not the proper subject of a declaratory relief because these issues would be necessarily adjudicated under Plaintiff's breach of contract claim. Declaratory judgment does not satisfy any of its intended objectives where, as here, the declaration sought will be adjudicated in Plaintiff's common law causes of action. *Chiste v. Hotels.com L.P.*, 756 F.Supp.2d 382, 407 (S.D.N.Y. 2010) (*citing CAMOFI Master LDC v. Coll. P'ship, Inc.*, 452 F.Supp.2d 462, 280-81 (S.D.N.Y. 2006)). Simply stated, there is no purpose to a declaratory judgment award and Plaintiff's request for one is not proper and should be dismissed for this reason alone.

In any event, however, herein Amalgamated has shown that Plaintiff's breach of contract claim is baseless (and therefore this declaratory judgment claim is similarly unsupported). Accordingly, to the extent the Court is inclined to award declaratory relief, it should declare that the Debtor was declared to be and was in default under the Loan Documents as of April 1, 2009 and that Amalgamated did not breach the Loan Documents when it properly exercised its rights and notified the Debtor of the default.

## F.  <u>Waste And Diminution Of Value Of Property Is Not A Recognized Claim, Is Duplicative, And Also Fails Based On the Undisputed Evidence.</u>

Amalgamated is entitled to judgment on Plaintiff's claim for waste and diminution of value of property as well.

This claim is premised upon the same exact allegations and complaints that Amalgamated has analyzed above and has shown are false and unsupportable. Specifically, in support of this claim Plaintiff alleges that the "Alleged Defaults were fabricated" and that Amalgamated "assume[d] complete control of the Debtor and the Sag Harbor Project." Complaint, ¶ 268. Plaintiff then claim that the Debtor was injured because Amalgamated thereafter refused to

33

further fund the Project and allowed the Project "to sit dormant" and deteriorate in value. Complaint, ¶ 269.

Frist, there is no statutory or common law basis to even support "waste" as a valid cause of action under New York law in connection with loan agreements between a lender and borrower, as here.

Second, as analyzed above, the evidence shows Amalgamated did not (and had no need to) fabricate any default by the Debtor.  The Debtor failed to comply with its basic contractual obligations as they are expressly set forth in the BLA, as Amalgamated contends, or even within the modified time-frame of June 30, 2009, as Plaintiff contends the Debtor and Amalgamated orally agreed.  Nor did Amalgamated assume any unlawful control over the debtor.  Instead, due to the Debtor's defaults – which included Debtor's failure to pay Amalgamated over $22 million, which was then due and owing -- the BLA expressly relieved Amalgamated from any obligation to fund the Project.  Having defaulted under the terms of the loan documents that gave Amalgamated the right to stop funding the Project in such event, the Debtor cannot complain of its own injuries (including, but not limited to, any loss in the value of the Property or its own inability to provide alternate funding to resume construction of the Project) when Amalgamated availed itself of its contractual remedies.  Accordingly, Plaintiff's claim for waste must fail.

### G.  The Objection To Claim Cannot Stand As The Only Claim In An Adversary Proceeding.

As analyzed above, Amalgamated should receive a directed verdict on all of Plaintiff's other claims in this adversary proceeding.  If that is the result, the Seventh Claim for Relief must also be dismissed because an "objection to claim" cannot exist as the only claim in an adversary proceeding.

Bankruptcy Rule 3007 permits an objection to claim to be asserted within an adversary proceeding. *See* Fed. R. Bankr. P. 3007 ("A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, ***but may include the objection in an adversary proceeding***.") (emphasis added). But this rule does not authorize an objection to claim to be asserted as the sole claim within an adversary proceeding. Indeed, Bankruptcy Rule 7001 sets forth the types of disputes that can create an adversary proceeding and an objection to a claim is not one of them. *Cf.* Bankruptcy Rule 7001(1) – (10). Because all of the other claims in this adversary proceeding should be denied, the objection to Amalgamated's claim should be determined by the court "after notice and a hearing" as contemplated by Section 502 of the Code. *See* 11 U.S.C. § 502(b).

In addition, Plaintiff's objection to Amalgamated's claim only seeks to decrease Amalgamated's claim by deducting interest properly added under the terms of the Loan Documents. As analyzed above, Amalgamated is able to demonstrate that it acted in accordance with the BLA and Loan Documents and that the Debtor was in fact in default of the Loan terms for several independent reasons and was not able to successfully negotiate a modification or other forbearance agreement. As a result, any and all fees or other interest added pursuant to the Loan Documents was wholly proper and Debtor's objection to claim should be dismissed in its entirety.

## II.    EACH OF PLAINTIFF'S CLAIMS IS BARRED BY THE DOCTRINE OF *IN PARI DELICTO* AND THE *WAGONER* DEFENSE.

Plaintiff's claims against Amalgamated are also barred because the Debtor acted with unclean hands and in bad faith in connection with the Loan, as the evidence at trial will demonstrate. The Debtor and its principals diverted funds duly paid by Amalgamated pursuant to several draw requisitions for Debtor's own use, therefore shorting the Mechanic's Lienors of

funds otherwise earmarked for them in the requisitions.  Debtor's actions, among other things, in doing so and in failing to contact the Mechanic's Lienors and communicate with them that Amalgamated had declared the Loan in default preclude Plaintiff standing in the shoes of Debtor from recovering on any of the claims in the Complaint.

As a result, the doctrine of *in pari delicto* and the *Wagoner* defense bar Plaintiff's claims here.  *Food Holdings Ltd. v. Bank of America Corp. (In re Parmalat Sec. Litig.)*, 477 F.Supp.2d 602, 693 (S.D.N.Y.2007).  *In pari delicto* is grounded in the equitable concept that "a plaintiff's recovery may be barred by his own wrongful conduct."  *Pinter v. Dahl*, 486 U.S. 622, 632 (1988).  The doctrine exists because, as a matter of equity, courts should not help a plaintiff profit from their wrongdoings.  *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir.1990).  The *in pari delicto* doctrine uses agency determinations to determine if a plaintiff should be prohibited from recovering damages due to his equal fault.  *LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F.Supp.2d 246, 278 (S.D.N.Y. 2007).

A bankruptcy trustee (and the Post Effective Committee here) "stands in the shoes of the bankrupt corporation."  *See Bankruptcy Services, Inc. v Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 447 (2d Cir.2008) (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir.1991)).  When a trustee or the Plaintiff herein take title to the Debtor's legal claims, the claims remain subject to all defenses available before bankruptcy.  *Food Mgmt.*, 380 B.R. at 693-94.  Thus, any wrongdoing imputed to the Debtor here also taints the claims.

Here, Plaintiff's Complaint make allegations against the Debtor and its principals:

> "Prior to entering into the Loan Agreements, Amalgamated conducted minimal due diligence with respect to the Debtor and its experience in the area of real estate developments." *See* Complaint at ¶¶ 33-38.

> "From the beginning of the relationship between the Debtor and Amalgamated, Amalgamated turned the blind eye toward the improprieties of the Debtor's Principals." *See* Complaint at ¶ 103.

> "Once construction of the Sag Harbor Project began in earnest, Amalgamated continued to overlook the improper actions taken by the Debtor, through its principals, which actions violated the terms of the Loan Agreements as well as New York Lien Law." *See* Complaint at ¶ 125.

> "Meanwhile, although aware of the shortages, Amalgamated did not advise the plaintiffs [i.e., the Mechanic's Lienors], or any other entity performing work on the Sag Harbor Project, of the shortages or that they should stop working." *See* Complaint at ¶¶ 116-21.

On May 30, 2013, Plaintiff commenced an adversary proceeding against Debtor's principals, Emil Talel and Michael Maidan (Case No. 8-13-08076) (the "Insider's Action") which is presently pending.  In the Insider's Action, Plaintiff also made numerous allegations relating to the conduct of the Debtor (itself here), including:

> "[F]rom the inception of its loans, the Debtor and its principals took money from the Debtor and diverted it to other resources". *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> The "Debtor created cash flow shortages and cause its general contractor to miss payments to the Mechanic's Lienors". *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> "[T]he Debtor and its principals remained silent and caused and actually directed the Mechanics Lienors to continue working." *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

> "[B]ut for the conduct of [Defendants Emil Talel, Michael Maiden, MM Sag Harbor LLC, Estate End Ventures LLC, 108-110 Duane Street Corp., and 108-110 Duane, LLC], the Mechanic Lienors would have been paid in full." *See* A.P. Docket No. 1, Insider's Action Complaint at ¶¶

These are just a small sample of the type of statements by this Plaintiff admitting Debtor's (it's own) wrongdoing and, at best, alleging that Amalgamated somehow was aware of

it, which is denied.  But even if true, such actions by the Debtor bar the claims under the doctrine of *in pari delicto* -- which translates to "in equal fault" in Latin.

## **<u>CONCLUSION</u>**

For the foregoing reasons and upon the foregoing authorities, defendant respectfully requests that the Court direct a judgment in its favor at trial.

Dated:  Uniondale, New York
       July 16, 2015

                    WESTERMAN BALL EDERER MILLER
                      ZUCKER & SHARFSTEIN, LLP


By:   */s/ Philip J. Campisi, Jr.*
        Philip J. Campisi, Jr., Esq.
        John E. Westerman, Esq.
        Mickee M. Hennessy, Esq.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Counsel To Amalgamated Bank, As Trustee*
*Of Longview Ultra Construction Loan Investment*
*Fund*

*1142546*

38