UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

EAST END DEVELOPMENT, LLC,

                    Debtor.

-----------------------------------------------------------------x
POST-EFFECTIVE DATE COMMITTEE OF THE
ESTATE OF EAST END DEVELOPMENT, LLC,

                    Plaintiff,

v.

AMALGAMATED BANK, as Trustee of
Longview Ultra Construction Loan Investment Fund
f/k/a Longview Ultra I Construction Loan Investment Fund,

                    Defendant.

-----------------------------------------------------------------x

Case No. 812-76181-reg

Chapter 11

Adv. Proc. No. 13-8081-reg

## DECISION AFTER TRIAL
### (Re: First, Second, Fourth and Fifth Claims for Relief)

Before the Court is an adversary proceeding arising out of the chapter 11 bankruptcy case

of East End Development, LLC ("Debtor"), an entity formed nearly ten years ago for the purpose

of acquiring certain real property in Sag Harbor, NY and developing it with luxury residential

condominiums.  The Defendant, Amalgamated Bank ("Defendant" or "Amalgamated"), provided

the Debtor with a commitment to finance approximately $28 million for the acquisition of the

land and construction of the property.  In or about 2009, the Debtor defaulted on the loan and

Amalgamated ceased funding at a time when construction was incomplete.  At that point

approximately $24 million of the $28 million commitment had been advanced.  Amalgamated

refused to advance the remaining approximately $4 million of its commitment.  In 2011, after

negotiations among the parties towards a consensual resolution failed, Amalgamated commenced foreclosure proceedings.

In October of 2012, the Debtor filed for chapter 11 bankruptcy relief citing "economic downturn," "various interruptions," "unexpected delays" as well as the exhaustion of its credit line with Amalgamated as reasons for seeking relief. The Debtor's goal in the bankruptcy was to obtain additional financing, finish the project and sell the finished condominium units pursuant to a chapter 11 plan. (Case No. 12-76181, ECF No. 2, ¶¶ 21-25).

Ultimately a chapter 11 plan was confirmed and the yet-unfinished property was sold to Amalgamated at a duly-noticed auction sale to Amalgamated. Since then it appears that construction of the property has been completed and the units are being offered for sale. Left unpaid were certain mechanics lienors which supplied materials and labor towards construction of the original project. By Order, dated May 3, 2013, the Plaintiff, a committee of unpaid mechanics lienors, was authorized to commence litigation on behalf of the Debtor's estate, and the proceeds of such litigation would be distributed pursuant to the confirmed plan. (Case No. 12-76181, ECF No. 128). Plaintiff commenced this litigation, as the estate representative, asserting breach of contract and related claims against Amalgamated. Although the allegations of the complaint are broader, the trial and this Decision relate only to the following claims: Breach of contract (First Claim for Relief), Breach of Implied Covenant of Good Faith and Fair Dealing (Second Claim for Relief), Unjust Enrichment (Fourth Claim for Relief), Declaratory Relief (finding that the Debtor was not in default at the time Amalgamated issued notice of default in July 2009) (Fifth Claim for Relief).[1]

---

[1]    The Plaintiff reserved its right to assert the remaining claims for relief under the Complaint.

The Plaintiff alleges that Amalgamated breached its contractual obligations with the Debtor when it: failed to fund the total commitment under the Loan Documents; failed to approve requisitions that were approved by Amalgamated's engineering consultants; issued improper notices of default or improperly caused Debtor's alleged defaults; required the Debtor to use approximately $1.25 million of the project funding to pay down obligations to Amalgamated on an unrelated project owned by the Debtor's principals; and permitted excessive and unsubstantiated draws by the Debtor's principals.  The Plaintiff argues that as a result of Amalgamated's breaches, the Debtor was unable to complete the project which caused damages to the Debtor in the amount of $5 million.

The issue before the Court is whether, under the terms of the various agreements between Amalgamated and the Debtor, Amalgamated breached legally enforceable obligations to the Debtor.  The Plaintiff is asking the Court to impose upon Amalgamated duties which are not imposed by the Loan Documents and afford the Debtor rights which are not afforded by the Loan Documents.  While it seems that the Debtor may have relied upon certain conduct of Amalgamated leading up to and following the issuance of the notices of default, and while Amalgamated's conduct in this matter may be questionable, the fact remains that the relationship between the Debtor and Amalgamated is governed by the Loan Documents.  It is the Plaintiff's burden to establish that Amalgamated's conduct violated the contractual agreements entered into between the parties so as to support the Plaintiff's claims for relief as set forth in the Complaint.

For the reasons that follow, the Court finds that the Plaintiff has failed to sustain its burden of proof on the First, Second, Fourth and Fifth Claims for Relief.

## FACTS

The Debtor is a New York limited liability company formed for the purpose of developing luxury residential condominiums at 21 West Water Street in Sag Harbor, NY ("Water Street Property" and "Water Street Project").  The Debtor has two members, each holding 50% interests:  MM Sag Harbor LLC ("MM Sag Harbor") and 21 West Water Street Holdings, Inc. ("21 West").  MM Sag Harbor is owned 50/50 by Emil Talel and Michael Maidan ("Maidan"), and 21 West is wholly owned by Paul Fiore and Nicola Tuosto.

On March 16, 2007, the Debtor acquired the Water Street Property for $7.2 million. [2] The Debtor financed the acquisition and development of the Water Street Property with loans from the Defendant, Amalgamated Bank, as trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund ("Ultra Fund"). The Ultra Fund is an ERISA fund which invests building trade union pension funds into construction loans on projects that employ union labor.   (Trial Tr., July 21, 2015, at 16). Amalgamated is the trustee and investment manager for the Ultra Fund.[3]  *Id*.  At all times Amalgamated acted as agent for the lender, Ultra Fund, not as lender.

The Debtor and Amalgamated, as trustee, entered into a Senior Loan Agreement in the amount of $3,600,000; a Building Loan Agreement ("BLA") in the amount of $16,347,825 (Pl's Ex. 1); and a Project Loan Agreement in the amount of $8,052,175 (Pl's Ex. 2) (together the "Loan Documents"), which were secured by first priority mortgages on the Water Street Property.  In total, Amalgamated agreed to lend the Debtor up to the aggregate sum of

---

[2]      Prior to the March 16, 2007 purchase by the Debtor, the Water Street Property was owned by 21 West.

[3]      Amalgamated is a majority union-owned bank.

$28,000,000.  According to the Loan Documents, the loan maturity and project completion date was April 1, 2009, subject to extension in accordance with section 2.1.5 of the BLA.  (Pl's Ex. 1)  The debt was guaranteed by the Debtor's principals, Messrs. Talel and Maidan, and an individual named Terry Soderberg.

Messrs. Talel and Maidan are also principals of East End Ventures, LLC ("EEV"), an entity formed for the purpose of owning and developing real property located at 5 Ferry Road, Route 114, Sag Harbor, NY ("Ferry Road Property" and "Ferry Road Project").  Prior to the Debtor's acquisition of the Water Street Property, EEV secured financing for the Ferry Road Project from Amalgamated, as trustee for the Ultra Fund, secured by the Ferry Road Property.  Although EEV and the Debtor were both owned by Messrs. Talel and Maidan, the funding commitments on the Ferry Road and Water Street Projects appear to be unrelated.

At the March 16, 2007 closing on the Water Street Property, the closing statement reflects there was a draw request for approximately $2.5 million consisting of "Reimbursements to Purchaser."  (Pl's Ex. 3).  Of that amount, $1.25 million was applied directly to EEV's loan on the Ferry Road Project to cover interest reserve shortages (the "Ferry Road Payment").  The closing statement shows that "Reimbursements to Purchaser" included a "Construction Mgmt – Developer" fee of $769,235 and "Developer Overhead" of $480,765, which add up to exactly $1.25 million.  The closing statement then shows that the "Ferry Road payment" of $1.25 million was subtracted from the total $2,531,970.51 "Reimbursements to Purchaser" thus reducing the Net Reimbursement to the Debtor.  (Pl's Ex. 3).

In addition to the $1.25 million "developer's fee" applied to the Ferry Road Project, at closing $539,299.51 was paid directly to each of Messrs. Talel and Maidan.  Mr. Talel testified that this was intended to reimburse them for costs associated with securing approvals for the

development of the Water Street Property, including hiring architects and engineers and actual out-of-pocket expenses. (Talel Dep., Mar. 17, 2015, at 56-57).

The Debtor retained RLW4 Construction, Inc. ("RLW4") to act as general contractor on the project, and RLW4 entered into a variety of subcontracts to perform services and furnish material and labor in connection with the project, including subcontracts with the mechanics lienors who make up the Plaintiff/Committee. The Debtor also hired Mark D'Andrea as a full-time project manager. Payment requisitions were prepared by RLW4 and reviewed by Mark D'Andrea prior to submission to Amalgamated for payment. Amalgamated retained Construction Management Systems ("CMS") as independent construction consultants. CMS would conduct site visits, issue periodic progress reports to Amalgamated, and recommend approval of payment requisitions by the Debtor.

Construction on the Water Street Project commenced on November 1, 2007. On January 14, 2008, CMS conducted the first of nineteen on-site visits to the Water Street Project, from January 14, 2008 to July 7, 2009. On November 5, 2008, CMS issued a progress report (#10) reflecting a projected completion date of August 30, 2009. (Pl's Ex. 32). On December 8, 2008, CMS issued a progress report (#12) pursuant to which the projected completion date was pushed to September 30, 2009. (Pl's Ex. 37). The projected completion date in the CMS progress report stayed at September 30, 2009 right up to the last progress report issued by CMS (#19) on July 29, 2009. (Pl's Ex. 38). After July 2009, CMS was replaced by GRS Consulting Group ("GRS") as Amalgamated's construction engineers.

On March 4, 2009, Mr. Talel faxed a letter, dated February 28, 2009, to Amalgamated requesting a 3-month extension of the Loan Documents (to July 1, 2009). (Pl's Ex. 48). There is no record of any written extension being granted by Amalgamated, except that on July 23, 2009,

an Amalgamated employee, Chris Burke, emailed another Amalgamated employee, Jessica Polanco, noting "it seems that we have granted the borrower a maturity extension to October 2009, however we do not see this memorialized anywhere." Mr. Burke went on to ask if any money was received by Amalgamated from the Debtor in connection with an extension. (Pl's Ex. 69). The parties do not dispute that no money was paid by the Debtor in connection with any extension request.

On July 27, 2009, Amalgamated's counsel faxed and emailed a letter to the Debtor's counsel, Bernard Jaffe, Esq., advising of the following defaults under the Loan Documents: (1) failure to complete the construction within the time frame set forth in the BLA, (2) failure to repay Amalgamated by April 1, 2009, the stated maturity date of the loan, (3) failure to remove mechanics liens filed by RLW4 Construction and A&F Fire Protection Co., Inc. against the Water Street Property. (Def's Ex. P). The letter advised that "Lender is preparing to take steps to enforce its rights and remedies under the Loan Documents." *Id.*

On July 29, 2009, Amalgamated sent a "Notice of Default" to the Debtor, Messrs. Maidan and Talel, and Terry Soderberg (as Guarantors). (Def's Ex. R). In that letter, Amalgamated notified the Debtor of the (a) failure to repay by the Maturity Date, and (b) failure to complete construction on time under section 4.1.21 of the BLA. Amalgamated also notified the Debtor that it was not obligated to, but specifically reserved the right to, fund any pending or future draw requests and accept payments from the Debtor without effectuating a waiver of any of its rights under the Loan Documents.

On July 30, 2009, Amalgamated sent another notice to the Debtor and the Guarantors. The notice cites the Debtor's failure to comply with the covenants of section 11.10 of the BLA

which require the Debtor to employ union labor and provides that the Debtor be given a 48-hour notice to cure such default.  (Def's Ex. S).

Amalgamated did not give RLW4 or the subcontractors notice of these defaults.  Mr. Talel claims to have advised RLW4 of the notices of default shortly after receiving them.  (Talel Dep., Mar. 17, 2015, at 46, 63).

On July 31, 2009, Amalgamated funded a July 10, 2009 payment request (No. 27) in the amount of $1,138,558.27.  On August 3, 2009, Amalgamated issued a "Notice to Borrower" advising the Debtor that although it was not required to fund any pending or future draw requests, Amalgamated elected to fund draw request No. 27.  In so doing, Amalgamated specifically advised that this was not a commitment to lend or modify the Loan Documents nor did it constitute a waiver of the Events of Default cited in the July 29 and 30, 2009 notices. (Def's Ex. T).

On August 5, 2009, RLW4 prepared another payment request in the amount of $1,551,894.09.  This request was submitted to Amalgamated on September 11, 2009 and was not funded.  (Pl's Ex. 82).  This was the final requisition submitted by the Debtor, construction ceased, and on December 4, 2009, the Water Street Project was winterized.  (Def's Ex. BB). Over an extended period of time, the Debtor and Amalgamated engaged in negotiations to modify the Loan Documents.  These negotiations failed, and on August 18, 2011, Amalgamated commenced a foreclosure action against the Debtor.  The Debtor answered the complaint in the foreclosure action and asserted counterclaims against Amalgamated.

On October 12, 2012, with still no resolution with Amalgamated, the Debtor filed for chapter 11 bankruptcy relief.  By Order, dated May 3, 2013, the Plaintiff, a committee of unpaid

mechanics lienors, was authorized to commence litigation on behalf of the Debtor's estate, and

the proceeds of such litigation would be distributed pursuant to the confirmed plan.  (Case No.

12-76181, ECF No. 128).  The Plaintiff filed the instant complaint ("Complaint") on May 30,

2013.  By Order entered September 27, 2013, the Court confirmed the Debtor's chapter 11 plan

and approved the sale of the Water Street Property to Amalgamated via credit bid after no other

bids for the Water Street Property were received.  (Case No. 12-76181, ECF No. 172).

## PROCEDURAL HISTORY

A trial was held on July 21 and 22, 2015.  At trial, the Plaintiff elicited testimony from

James Freel, senior vice president of Amalgamated, and introduced the deposition testimony of

the following individuals:  Emil Talel, principal of the Debtor; Wayne R. Shekailo, principal of

CMS, and Rick Markisoto, of GRS.  The Defendant presented testimony by Leanne Lipsi, credit

officer of Amalgamated, and Steven Cerniglia, Esq., outside counsel to Amalgamated.

Pursuant to stipulation in the joint pretrial memorandum, Plaintiff's Exhibit Nos. 1

through 85, and Defendant's Exhibits A through MM, were admitted into evidence.  At the

conclusion of trial, the record was left open to permit the Plaintiff to submit additional exhibits,

and on October 30, 2015 the Plaintiff submitted supplemental exhibits numbered 86, 87, and 88.

On October 30, 2015, the Plaintiff and Defendant each filed proposed findings of fact and

conclusions of law, and at that time this matter was taken under submission.

**DISCUSSION**

### A. *In pari delicto and the Wagoner Rule*

The Defendant asserts that the Plaintiff's claims in this action are barred by the doctrine of *in pari delicto* and the *Wagoner* rule. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). They argue that the Plaintiff, standing in the shoes of the Debtor, is barred from asserting these claims where the Debtor "acted with unclean hands and in bad faith in connection with the Loan." (Def's Post-Trial Br., Adv. Pro. No. 13-8081, ECF No. 73, at 58). Defendant cites to allegations of the Complaint which state, in substance, that Amalgamated turned a blind eye toward the improprieties of the Debtor's principals, in that the Debtor's principals caused funding shortages in the amounts transferred by the Debtor to the general contractor, RLW4. (Complaint, Adv. Pro. No. 13-8081, ECF No. 1 ¶¶ 33-38, 103, 125, 116-21). The Defendant also cites to allegations contained in a separate complaint filed by the Plaintiff against the Debtor's principals, Messrs. Talel and Maidan, which make direct allegations of diversion of funds. (Complaint, Adv. Pro. No. 13-8076, ECF No. 1).

The doctrine of *in pari delicto* is an affirmative defense available in situations where it is proven that the plaintiff and defendant were equally at fault for the wrongdoing alleged by the plaintiff. *See Kirschner v. KPMG LLP,* 15 N.Y.3d 446 (N.Y. 2010) ("[T]he courts will not intercede to resolve a dispute between two wrongdoers."). The *Wagoner* rule is an extension of this doctrine, created by the Second Circuit Court of Appeals, which prevents any party standing in the shoes of a debtor in bankruptcy, i.e., a bankruptcy trustee or, in this case the Plaintiff, from having *standing* to bring any action on the debtor's behalf where the debtor in that case was

equally at fault for the wrongdoing alleged.  The *Wagoner* rule relies on the imputation of the bad acts of corporate principals, to the debtor-corporation.[4]

The Court finds that neither the *Wagoner* rule nor the *in pari delicto* doctrine defeat the Plaintiff's First, Second, Fourth or Fifth Claims for Relief.  None of these claims rely on any wrongdoing by the Debtor or its principals.  Rather the allegations underlying these claims focus strictly on Amalgamated's conduct, its alleged failures, resulting in the alleged liability for breach of contract and related claims.  The fact that there are suggestions in the Complaint, and a related complaint, that the Debtor's principals may have diverted funds away from the Water Street Project does not defeat standing under *Wagoner*.  These allegations are not necessary to prove the First, Second, Fourth or Fifth Claims and thus the alleged wrongdoing by the Debtor's principals is not essential to the claims at issue here, and *Wagoner* does not create a bar to the Plaintiff's standing.  This Court's ruling on this issue in *BC Liquidating, LLC v. Weinstein et al.* is directly on point.  The Court stated:

> . . . [T]he Court finds that since the Debtor Causes of Action – i.e., for conversion, aiding and abetting conversion, unjust enrichment, constructive trust, and accounting – do not involve fraud or complicity on the part of BCF, the *Wagoner* Rule does not apply.[5]  In order for the *Wagoner* Rule to apply, and thus bar suit, the complaint must allege that the company, or an officer whose actions are imputed to the company, actively engaged in wrongful conduct with the Defendants.  Courts have held that the *in pari delicto* defense, and thus *Wagoner*, only apply if the corporation or its agents were "an active, voluntary participant" in the alleged wrongdoing.  *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 14-cv-2197VM, 2014 WL 3402602 at *3 (S.D.N.Y. July 9, 2014).

> . . .

---

[4]     The Court will assume familiarity with the intricacies of the *in pari delicto* defense, and the *Wagoner* rule and its progeny.

[5]     The Court recognizes the inconsistency of pleading fraud with the involvement of BCF's management, as stated in the Lender Causes of Action, and at the same time pleading a fraud on the company without the involvement of management, as stated in the Debtor Causes of Action.

. . .

Unlike claims for fraud that require a relationship between the company and the defendant, the Debtor Causes of Action do not require that the company or its officers conspired together or assisted each other. The Defendants could have, as the Complaint alleges, misappropriated funds for bogus consulting contracts and work never completed with or without the presence of an overarching scheme. This is similar in many respects to *MF Global*, where the court found that the allegations against PwC for malpractice and negligence were not barred by *in pari delicto*. *MF Global*, 2014 WL 3402602 at *3-5. The key in that case was that the claims for malpractice and negligence focused on alleged improper advice that PwC gave to MF Global and on which MF Global detrimentally relied. The claims did "*not* arise out of the active, voluntary acts of MF Global employees" and so *in pari delicto* did not bar the claims. *Id*. at 4 (emphasis added). The Debtor Causes of Action in this case are analogous as they also do not require any wrong doing or complicity on behalf of BCF or its officers.

*BC Liquidating, LLC v. Weinstein et al. (In re BC Funding, LLC),* 519 B.R. 394 (Bankr. E.D.N.Y. 2014),

For all of these reasons, the Defendant's argument that the Plaintiff's First, Second, Fourth and Fifth Claims for Relief are barred by the *Wagoner* rule, fails.

### B. *Statute of limitations*

The Defendant also argues that "any claim Plaintiffs have made based on the application of the development fees towards the Ferry Road Loan is barred by New York's statute of limitations." (Def's Post-Trial Br., Adv. Pro. No. 13-8081, ECF No. 73, at 55-58). The Ferry Road Payment was made on March 16, 2007, and even assuming the longer of the potentially applicable statutes of limitation, the Defendant argues that the limitations period ended on March 16, 2013, two months prior to the commencement of this action.

The First and Second Claims for Relief alleged in the Complaint seek damages for breach of contract and breach of implied covenant of good faith and fair dealing. Both claims rely on

Amalgamated's alleged failure to fund the unpaid commitment, failure to fund approved requisitions and issuance of improper notices of default. Each of these alleged failures by Amalgamated occurred in or about July 2009, not March 2007. (Complaint, Adv. Pro. No. 13-8081, ECF No. 1, at 32-34).[6] The statute of limitations for these claims is six years and thus the Plaintiff's time did not run until July 2013. *See* N.Y. C.P.L.R. 213 (McKinney 2004); *Geler v. National Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991) (noting that breach of duty of good faith and faith dealing "is merely a breach of the underlying contract").

The statute of limitations on the Fourth Claim for Relief for unjust enrichment is also six years. *See Maya NY, LLC v. Hagler*, 965 N.Y.S.2d 475, 477 (N.Y. App. Div. 2013) (statute of limitations on unjust enrichment claim is six years where unjust enrichment and breach of contract claim arise from the same set of facts). The unjust enrichment claim relies on Amalagamated's alleged enrichment resulting from the work performed on the project after the notices of default were issued and for which Amalgamated did not fund approved requisitions. This work and the failure to fund occurred in or around July through September of 2009. This claim does not rely on the Ferry Road Payment and the statute of limitations did not run prior to the filing of this Complaint.

Finally, the Fifth Claim for Relief seeks declaratory judgment that the Debtor was not in default of the Loan Documents at the time Amalgamated issued the July 2009 notices of default. This claim is sufficiently linked to the Plaintiff's breach of contract claim that the six year statute

---

[6]        The Plaintiff's post-trial memorandum includes the Ferry Road Payment within the alleged breaches. The Complaint does not. The Court finds that the Complaint controls, and in any event, the Court's ruling for the Defendant moots this issue.

of limitations on breach of contract actions also applies to this claim.  *See Solnick v. Whalen*, 49

N.Y.2d 224, 229-30 (N.Y. 1980).  Therefore, this claim is not barred.

### C. First Claim for Relief.  Breach of contract.

#### 1. Was the Maturity Date extended?

The Plaintiff argues that the July 2009 notices of default based on maturity and

completion date defaults were issued in error because the initial April 1, 2009 maturity date was

extended to July 1, 2009 and then to October 1, 2009.  The Plaintiff claims that: (1) Mr. Talel

requested an extension to July 1, 2009 in writing, which was not explicitly denied by

Amalgamated; (2) a verbal extension was granted at a meeting between the Debtor and

Amalgamated representatives in April of 2009; (3) an internal email among Amalgamated

employees, dated July 23, 2009, suggests that a verbal extension to October 2009, may have

been granted (Pl's Ex. 69); (4) Amalgamated treated this loan as an active loan right up to the

date of the first notice of default issued July 29, 2009; and (5) as early as August 2008,

Amalgamated's construction engineer's progress reports projected completion dates beyond the

original April 1, 2009 date, and thus Amalgamated was on notice of the construction delays and

should be deemed to have waived any right to assert this default.  (*See e.g.*, Pl's Ex. 26).

The Plaintiff suggests that communications from Amalgamated led the Debtor to believe

all that was needed to gain an extension of the maturity date was a written request.  Specifically,

the Debtor relies on a February 24, 2009 email from Guy Penland, Assistant Manager of

Amalgamated, to Sabina Schwalbe, the Debtor's administrative assistant, advising that the Water

Street loan is set to expire on April 1, 2009, and "[t]here are 2 three-month loan extensions

available per a written request form East End to the Fund.  If you intend to extend the loan,

please send us a formal written request by 2/27/09."  (Pl's Ex. 46).  In response, Mr. Talel, by

letter dated February 28, 2009, and faxed on March 4, 2009, requested a three-month extension

of the maturity date (i.e., to July 1, 2009). (Pl's Ex. 48). The Plaintiff argues that the Debtor

was led to believe that the written request would suffice to extend the loan term, and the

Defendant has failed to produce evidence that the extension *was not* granted. The Plaintiff also

cites to the fact that the maturity date extension is reflected in a variety of Amalgamated's own

documents which show that the July 1, 2009 date is the "lending commitment", or "projected

payoff date" or "current maturity date." (Pl's Ex. 47, 54, 58, 60**)**. This, the Plaintiff argues, was

also reflected by Amalgamated's failure to put the loan in default as of April 2, 2009, and

specifically, that the Investment Committee of the Ultra Fund met on April 23, 2009 and did not

raise any issue with the Debtor's failure to satisfy the loan by April 1, 2009. Plaintiff relies on

Mr. Talel's testimony that a verbal extension was granted at a meeting held between the Debtor

and representatives of Amalgamated in the spring of 2009. (Talel Dep., Mar. 17, 2015, at 36–38).

Finally, Plaintiff relies on the July 23, 2009 email among Amalgamated employees suggesting

that a maturity extension to October 2009 may have been granted. (Pl's Ex. 69).

Amalgamated denies any express or implied extension of the Maturity Date citing to the

Debtor's failure to satisfy the contractual conditions precedent to a maturity date extension and

the Debtor's failure to provide evidence that an extension was in fact granted despite the failure

to satisfy the conditions. Amalgamated also cites to sections 9.7 and 10.4 of the BLA, which

require all modifications to the Loan Documents be done in writing and signed. To the extent

the Plaintiff relies on the September 2009 projected completion dates found in the CMS progress

reports, Amalgamated argues CMS had no authority to extend the project completion dates, and

the progress reports are in no way a written extension of time. Finally, Amalgamated notes that

any maturity date extension would have had to be approved by the Trust Committee of the Ultra

Fund, and no such approval was given or even considered by the Committee.

Ultimately, this issue must be determined based upon the contractual agreements which

dictate the parties' rights and responsibilities.  Section 2.1.5(a) of the BLA provides that the

original term of the loan was to expire on April 1, 2009.  (Pl's Ex. 1).  Section 2.1.5(b) gave the

Debtor an option to extend the Maturity Date for two consecutive 3-month periods subject to the

satisfaction of certain conditions:

> (a) Borrower shall have given Agent written notice (the "Extension Notice") of such extension by no later than 120 days nor any earlier than 30 days prior to each respective Maturity Date;

> (b) Borrower shall have paid or caused to be paid to Administrative Agent the non-refundable Extension Fee for each such Extension equal to one quarter of one (.25%) percent of the outstanding principal balance of the amount of the Loan outstanding at the time of the extension for each three (3) month period;

> (c) No monetary Default or Event of Default shall have occurred and be continuing at the time of, or any time after, the delivery of the Extension Notice;

> (d) Agent shall have received a date down endorsement to its Title Insurance Policy indicating no change in the condition of title to the Property;

> (e) Borrower shall have paid all costs and expenses actually incurred by Agent in connection with such extension, including underwriting, title and reasonable legal fees and costs;

> (f) Completion of the Improvements shall have occurred;

> (g) Each of the [Loan Documents] must be concurrently extended to the extent the same remain outstanding;

> (h) Borrower shall deliver monthly income statements and sales reports and other information reasonably required by Lender, and

> (i) During any Extension Period, Borrower shall pay to Lender the monthly interest due on the Loan not later than the last day of each month or make other arrangements acceptable to Lender to pay interest.

These conditions are presented in the conjunctive and as such each of the conditions must be met. The written request for an extension by Mr. Talel on March 4, 2009, satisfied the first condition necessary for an extension to July 1, 2009. The Plaintiff does not contend, nor does the record show, that the Debtor satisfied each (or any) of the other conditions necessary for an extension. For example, it appears that the Debtor did not pay an Extension Fee, and it is undisputed that the project was not completed at the time the extension was requested. None of the arguments advanced by the Plaintiff changes the plain language of the contract and the fact that the Debtor had not met the requirements for an extension of the Maturity Date of the loan. Further, the Debtor has produced no evidence to support the notion that Amalgamated explicitly waived these conditions. In fact, not only does Amalgamated deny having granted an extension at the spring 2009 meeting, Amalgamated denies that there even *was* a spring 2009 meeting. The only evidence the Plaintiff produced of this alleged meeting is Mr. Talel's own recollection, which is questionable at best, and the minutes of a meeting of the Ultra Fund investment committee, dated April 23, 2009, which reflect: "Mr. Fierce said he plans to meet with the borrower." (Pl's Ex. 59). When asked about the alleged maturity date extension, Mr. Talel testified that he knew Amalgamated granted him an extension in response to his February 2009 letter "Because they didn't object to the extension." (Talel Dep., Mar. 17, 2015, at 30). When asked whether he recalled asking for an extension after February of 2009, his response was "It's possible. I don't remember." (*Id*. at 31). Even if that meeting did take place in the spring of 2009, there is still no evidence of an extension being granted in writing. In addition, Mr. Freel, Senior VP at Amalgamated, testified that any modification to the Loan Documents would have to be reviewed by the Investment Committee of the Ultra Fund and approved by the Trust Committee, and no such review or approval was undertaken. (Trial Tr., July 21, 2015, at 128-

130).  Finally, although Amalgamated continued to fund draw requests after April 1, 2009, and allowed construction to continue following the July 2009 notices of default, the BLA specifically allowed Amalgamated to do so without waiver of the Debtor's defaults.  (Pl's Ex. 1, §§ 9.2(d), 9.7).

Although there is evidence in the record to suggest that Amalgamated did not treat this loan as defaulted as of April 2, 2009, the Court believes it would have been within its rights to do so.  Even if the Court believed that the record supported a finding that an extension to July 1, 2009 was granted because of the internal loan summaries showing a July 1, 2009 maturity date, there is little if anything in the record to show that the Debtor satisfied the conditions of the contract necessary to a further extension beyond July 1, 2009 or that Amalgamated treated this as a performing loan after that date.  The only suggestion that there may have been an extension beyond July 1, 2009 is the July 23, 2009 email among Amalgamated employees.  However, that email has little if any probative value in establishing that the conditions necessary to an extension were met.  In addition, both Steve Cerniglia, Amalgamated's outside counsel, and Leanne Lipsi, credit officer at Amalgamated, testified at trial that no extension was granted. (Trial Tr., July 22, 2015, at 29, 68).

Finally, the Court finds that the CMS progress reports which projected completion dates into September 2009 are not proof that an extension was granted, merely proof of the date CMS projected for completion.  Aside from the fact that the CMS progress reports showing a projected completion date of September 2009 in no way substitutes for the satisfaction of the contractual requirements necessary for an extension, CMS had no authority to grant such an extension. (Shekailo Dep., Mar. 16, 2015, at 17) (testifying that he had no authority to represent Amalgamated in any way).  That the CMS progress may have put Amalgamated on notice that

the project was running behind schedule should not prejudice Amalgamated's rights to enforce the terms of the Loan Documents as written.

Thus, the Court finds that there was no extension of the April 1, 2009 Maturity Date of the loan.

### 2. Were the notices of default defective?

The Plaintiff also argues that Amalgamated did not provide proper notice of default and an opportunity to cure as required by the Loan Documents. In support, the Debtor cites to section 9.1(a)(xiv) of the BLA, a subsection of the "events of default" section, which states:

> . . . If Borrower shall continue to be in Default under any of the other terms, covenants, or conditions of this Agreement or any other Loan Document not specified in subsections (i) to (xii) above or in subsections (xv) to xxv below, for ten (10) days after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for fifteen (15) days after notice from Agent in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 15-day period and provided further that Borrower shall have commenced to cure such Default within such 15-day period and thereafter diligently and expeditiously proceeds to cure the same, such 15-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed forty-five (45) days;

Subsections (i) through (xi) and (xv) to (xxv) constitute all of the Events of Default specified under section 9.1(a).

Amalgamated argues that upon expiration of the Maturity Date, it was not required to provide any opportunity to cure under the BLA because the defaults cited, i.e., payment and completion date defaults, are not covered by the cure provisions of section 9.1(a)(xiv). Rather, Amalgamated argues that section 9.2(a) and 9.2(d) of the BLA allow Amalgamated to

immediately exercise its remedies upon the occurrence of an Event of Default without any cure period.

Section 9.2(a) of the BLA states that "Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to [Amalgamated] against [Debtor] under this Agreement . . . may be exercised by [Amalgamated] at any time and from time to time, whether or not all of the Debt shall be declared due and payable and whether or not [Amalgamated] shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Building Loan Documents . . .." Further, section 9.1(d) of the BLA provides that "Upon the occurrence of an Event of Default, Amalgamated may declare Lenders' obligations to make Advances hereunder to be terminated, whereupon the same shall terminate, and/or declare all unpaid principle of and accrued interest on the Building Loan Note, . . . to be immediately due and payable, whereupon same shall become and be immediately due and payable . . ." (Pl's Ex. 1).

The Court agrees with Amalgamated. The 10 and 15-day notice to cure provisions of section 9.1(a)(xiv) only apply to defaults under terms, covenants or conditions of the Loan Documents **other than** those specified in section 9.1(a)(i) to (xiii), and (xv) to (xxv). The defaults called by Amalgamated were for payment date (section 9.1(a)(i)) and completion (section 9.1(a)(xvi)) failures which, by the express terms of the BLA, do not require an opportunity to cure. Therefore, the Court finds that the notices of default issued by Amalgamated were not defective under the Loan Documents due to a failure to provide a cure period.

### 3. *Did Amalgamated cause the Debtor's defaults?*

The Plaintiff argues that Amalgamated was the cause of the Debtor's payment default because it required the Debtor to apply $1.25 million of the initial draw to fund interest reserve shortage on the Ferry Road Project which immediately put the Water Street Project out of budget. The Plaintiff also argues that Amalgamated's requirement was contrary to the Loan Documents which prohibit the use of loan proceeds for any purpose other than construction of the Water Street Property. (Pl's Ex. 1, §4.1.18, 2.1.4). The Plaintiff's argument is supported by Mr. Talel's trial testimony that Amalgamated made it a condition of funding the Water Street Project that $1.25 million of the initial draw be applied to the Ferry Road Project.

Amalgamated does not dispute that $1.25 million of the initial draw was used towards the Ferry Road Project. However, Amalgamated takes the position that the $1.25 million was a "developer's" or "project management" fee which the Debtor was entitled to, and which, although not mentioned in the Loan Documents, was built into early project budgets. (Def's Ex. G (Jan. 2006 budget showing "soft cost" of $1.2 million for "management fee"; Def's Ex. H (Nov. 2006 budget showing "project management" fee of $1.95 million); Def's Ex. I (April 2008 budget showing $1.2 million "construction mgmt. – developer fee"); Def's Ex. KK (budget showing $1.2 million soft cost "construction mgmt. – developer")). Amalgamated argues that it did not compel the Debtor to use the funds for the Ferry Road Project; rather, the decision to make such payment was "an agreement between all parties . . ." (Def's Post-Trial Br., Adv. Pro. No. 13-8081, ECF No. 73, at 15).

In response the Plaintiff points out that although early budgets reflected a total of $1.95 million allocated to construction management/developer fees and overhead, the Debtor received

a total of over $3 million from the loan proceeds which were labeled either "construction management" or "developer overhead" including the Ferry Road Payment.

It is the Plaintiff's burden to prove that Amalgamated required and directed that the Ferry Road Payment be made.  Even if proven, the Plaintiff must then show that Amalgamated's actions constituted a breach of the loan documents.  The trial record does not support the Plaintiff's allegations.  Mr. Talel clearly testified that the Ferry Road Payment was made strictly out of the developer or construction management fee, not out of funds that were budgeted for construction.  He also testified that this payment was made voluntarily.  (Talel Dep., Mar. 17, 2015, at 55-56).   If these funds were misallocated to the Ferry Road Project, it was the Debtor's principals who did so, not Amalgamated.  Absent some proof that Amalgamated *required* the Debtor to use the Water Street loan proceeds to pay down the Ferry Street debt, of which there is none, the Court is not prepared to find that the payment of Water Street loan proceeds towards the debt of a related entity has any bearing on the Debtor's breach of contract claims.[7]

The Plaintiff also argues that the payment of a developer's fee is not specifically authorized by the Loan Documents and questions whether the Debtor's principals should have been permitted to draw *any* funds from the project.  (Pl's Post-Trial Br., Adv. Pro. No. 13-8081, ECF No. 74, at 50 ("Despite repeated demand for documents to substantiate the permissibility of the Developer's Fee, the Defendant has not produced anything.")).  However, this argument inappropriately shifts, from the borrower to the lender, the burden of ensuring the proper use of loan proceeds.  It is also important to note on this point that the Plaintiff in this litigation derives

---

[7]    There may have been other consequences to using secured loan proceeds to pay down the debt of a non-debtor, but that issue is not before the Court.

its standing from the Debtor, and it would be inappropriate for the Plaintiff, standing in the Debtor's shoes, to argue that the Debtor misappropriated funds.

Finally, the Plaintiff argues that certain of the defaults called by the Defendant were defaults that arose out of the Amalgamated's failure to continue funding.  For example, the Debtor could not pay for insurance, obtain a new building permit or employ union-affiliated subcontractors, because Amalgamated withdrew the Debtor's sole source of funding.  As stated elsewhere in this Decision, this Court finds that Amalgamated properly exercised its remedies under the Loan Documents based upon maturity and completion date failures and was within its rights to withdraw funding.  The consequences that flowed from that are the Debtor's to bear, not Amalgamated's.

### 4. Did Amalgamated's funding of requisitions after notices of default were issued constitute a waiver of the default?  And did Amalgamated's subsequent failure to fund approved requisitions and satisfy the full funding commitment constitute a default under the Loan Documents?

The Plaintiff argues that (a) Amalgamated waived the Debtor's alleged defaults when it funded requisitions after the July 2009 notices of default were issued, (b) Amalgamated's subsequent failure to fund requisitions which were approved by its engineering consultant, CMS, constituted a breach of the contract, and (c) Amalgamated's failure to fund the full $28 million committed to the Water Street Project constituted a default by Amalgamated.

In response, Amalgamated cites to section 9.2(d) of the BLA which states that ". . . Lenders may make Advances or parts of Advances [after the occurrence of an Event of Default] without thereby waiving the right to demand payment of the Building Loan Note, without becoming liable to make any other or further Advices, and without affecting the validity of or enforceability of the Building Loan Documents."  (Pl's Ex. 1).  Also, section 9.7 of the BLA

states: "The making of an Advance hereunder during the existence of an Event of Default shall not constitute a waiver thereof." (Pl's Ex. 1).

Based on the plain terms of sections 9.2 and 9.7 of the BLA, the Court cannot find that Amalgamated in any way waived the Debtor's defaults when it funded the post notice-of-default draw request (No. 27). In addition, the Plaintiff has not established that the approval of the draw request by CMS in any way obligated Amalgamated to fund a draw request submitted after events of default had occurred. It flows from these conclusions that in light of the Debtor's payment and completion date defaults, Amalgamated's failure to fully fund the commitment amount did not constitute a default by Amalgamated. For these reasons, the Plaintiff's arguments – that Amalgamated breached the contract by failing to fund all approved requisitions, and that Amalgamated waived the Debtor's breach by funding requisitions after the issuance of notices of default – fail.

### 5. *Did Amalgamated's failure to require strict adherence to the contract terms constitute a waiver of the Debtor's defaults or create an oral modification of the Loan Documents?*

The Plaintiff argues that Amalgamated's failure to strictly adhere to the contract terms constituted a waiver of the Debtor's defaults and effected a modification of the Loan Documents. The Plaintiff argues that it would be inequitable to require strict adherence to the terms of the Loan Documents because Amalgamated repeatedly modified the terms of the agreements when it saw fit to do so. In support, the Plaintiff argues that: Amalgamated required the Debtor to apply $1.25 million of the closing draw to the Ferry Road project which was in direct violation of the Loan Documents' prohibition on the use of loan proceeds for anything other than the Water Street Project, *see, e.g.,* Pl's Ex. 1, §§ 2.1.4 (use of proceeds), 4.1.18 (application of loan proceeds), 4.2.12 (no distributions to insiders); Amalgamated permitted the Debtor's principals

to take $1,078,599.02 in largely-undocumented reimbursements of pre-closing expenses; Amalgamated did not require the Debtor to provide a contemporaneous building loan budget or lien waivers, and allowed the Debtor to complete project plans and specifications six months post-closing date.  Due to these lapses, Plaintiff argues that the Debtor was entitled to rely on Amalgamated's "actions and words" rather than the terms of the Loan Documents.  The Plaintiff also argues that the Debtor reasonably relied on Amalgamated's oral representations that the loan maturity and completion dates were extended when the Debtor continued to work on the project past July 1, 2009 – to Amalgamated's benefit – and Amalgamated should be equitably estopped from asserting the protections of the Loan Documents.

Amalgamated relies on sections 9.7 and 10.4 of the BLA which requires that any modifications to the BLA be in writing and signed by the party against whom enforcement is sought.  Amalgamated also cites section 10.5 of the BLA which states:

> Neither any failure nor any delay on the part of [Amalgamated] . . . in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.

New York General Obligations Law §15-301[8] prohibits oral modifications of written agreements, but case law provides that oral modifications or waivers may be permitted:  "(1) when there has been partial performance of an agreement to modify so long as the partial performance is unequivocally referable to the oral modification, or (2) when one party has

---

[8]    New York General Obligation Law §15-301 provides: "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

induced the other party to rely on an oral modification such that the first party may be equitably estopped from invoking the requirement that any modification be in writing." *DiStefano v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004) (citation omitted).  However, "[i]f the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).  The same is true of conduct claimed to have been performed in reliance on the oral modification. *Id.*  The partial performance must be unequivocally referable to the new contract. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (citation omitted).

The Plaintiff is asking this Court to find that Amalgamated's actions effected an oral modification of the maturity and completion dates provided for in the Loan Documents, and as such to find the notices of default issued by Amalgamated were issued in error.[9]  Consistent with case law cited by both parties, in order to make this finding the Court would have to find that Amalgamated partially performed this alleged modified agreement and that this partial performance is "unequivocally referable" to the alleged modified agreement.

The Court cannot find that Amalgamated's actions were unequivocally referable to an oral modification of the maturity and completion dates for the Water Street Project.  First, the Court already found that the Plaintiff failed to prove that there was an oral modification of the Loan Documents.  At best, the fact that Amalgamated failed to call the Debtor's payment and completion default in April 2009 would tend to support a finding that the maturity date was extended to July 1, 2009 (that is if the Court ignores the plain terms of the Loan Documents

---

[9]    To the extent the Plaintiff is asking this Court to nullify the Loan Documents in their entirety the Court can find no authority to do so, especially on the record of this case.

which require such an extension to be in writing).  However, there is *no* basis upon which the Court could find that the maturity date was extended past July 2009 when the defaults were called.

Second, the Court has also found there is no evidence that Amalgamated required the Debtor to apply $1.25 of the closing draw to pay down the Ferry Road Project.  Even if Amalgamated permitted such payments and/or excessive draws by the Debtor's principals, and such permission was in violation of the Loan Documents, this action could not be seen as referable in any way to an extension of the maturity and completion dates.  Similarly, the failure, if any, by Amalgamated to enforce the requirements of the Loan Documents with respect to budgets, plans, specifications and/or lien waivers in no way is referable to maturity and completion date extensions.  Rather, any such enforcement failures by Amalgamated are specifically dealt with under section 9.7 of the BLA which states that no course of dealing, delay or omission by Amalgamated in exercising any right shall operate as a waiver of that right.

Finally, Amalgamated's continued funding and failure to notice the Debtor's default immediately in April 2009 is entirely consistent with sections 9.2(d) and 9.7 of the BLA which specifically provide that the making of advances after the occurrence of an event of default does not constitute a waiver of the default.  *See Village on Canon v. Bankers Trust Co.,* 920 F. Supp. 520, 527 (S.D.N.Y. 1996) (finding that acceptance of payments and failure to commence foreclosure is not "unequivocally referable to an agreement to extend the loan because they are each wholly compatible with the terms and conditions of the written loan documents."); *see also Gaia House Mezz LLC v. State Street Bank*, 720 F.3d 84, 91 (2d Cir. 2013) (Lender's "course of performance, including its disregard of particular contractual obligations on [the borrower's] part

from time to time, was consistent with the Agreement, and the Agreement remains enforceable.")
(citation omitted).

The Court also finds that the Plaintiff has not satisfied its burden of proving that
Amalgamated should be equitably estopped from invoking the requirement that any modification
be in writing.  "The party alleging equitable estoppel must demonstrate:

> (1) An act constituting a concealment of facts or misrepresentation; (2) An intention or
> expectation that such acts will be relied upon; (3) Actual or constructive knowledge of
> the true facts by the wrongdoers; (4) Reliance upon the misrepresentation which causes
> the innocent party to change its position to its substantial detriment."

*Gaia House*, 720 F.3d at 90 (citation omitted).

The Court already found that the Plaintiff failed to prove that there was a modification of
the maturity and completion dates, oral or otherwise.  There is no evidence of any
misrepresentation or concealment of facts by Amalgamated, and therefor Plaintiff cannot have
shown that Amalgamated induced the Debtor to rely on any oral modification such that equitable
estoppel should apply.

### 6.  Conclusion

As cited by the Plaintiff, "Under New York law,

> In order to recover from a defendant for breach of contract, a plaintiff must prove,
> by a preponderance of the evidence, (1) the existence of a contract between itself
> and that defendant; (2) performance of the plaintiff's obligations under the
> contract; (3) breach of the contract by that defendant; and (4) damages to the
> plaintiff caused by that defendant's breach."

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)
(citations omitted).

Based on all of the foregoing, the Court finds that a contract did exist between the Debtor and Amalgamated.  However, the Plaintiff has failed to prove that the Debtor performed its obligations under that contract or that the Defendant breached the contract.  Therefore, the First Claim for Relief will be denied.

### D.  *Second Claim for Relief.  Breach of the implied covenant of good faith and fair dealing*

As an alternative to the breach of contract claim, the Plaintiff argues that Amalgamated breached the implied covenant of good faith and fair dealing under the Loan Document and deprived the Debtor of the benefit of its bargain when it: failed to fund the Unpaid Commitment thereby preventing completion of the Water Street Project; failed to timely fund approved requisitions thereby causing work slow-downs and stoppages; and alleged defaults by the Debtor which had not occurred or were precipitated by Amalgamated's default.  In addition, the Plaintiff's post-trial memorandum argues that Amalgamated's requirement to pay down $1.25 million on the Ferry Road project, along with allowing the unsubstantiated reimbursements to the Debtor's principals and the payment of excessive developer's fees, all deprived the Debtor of the full benefit of its bargain thus creating liability for Amalgamated.  (Pl's Post-Trial Br., Adv. Pro. No. 13-8081, ECF No. 74, at 54).

Amalgamated argues that the Plaintiffs claims in this regard are duplicative of the breach of contract claim; that the factual allegations in support of the breach of contract claim have been proven false at trial; and that a breach of the covenant of good faith and fair dealing claim cannot be used to infer rights or obligations that contradict the parties contractual obligations.  *See Gaia House*, 720 F.3d at 94 n.5.

> In order to find a breach of the implied covenant, a party's action must "directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407–08 (2d Cir.2006) (quotation marks omitted). The covenant cannot be used, however, to imply an obligation inconsistent with other terms of a contractual relationship. *Dalton,* 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289."

*Id*. at 93.

The Plaintiff again relies on the Ferry Road Payment as a basis to support Amalgamated's liability, and the Court reiterates: (1) the Plaintiff has not proven that Amalgamated *required* the Ferry Road Payment to be made, and (2) Amalgamated's allowing, rather than requiring, the Debtor to apply a portion of the developer's fee to another project should not create liability for Amalgamated.  The same goes for the Plaintiff's allegation that the Debtor's principals took excessive draws and/or draws for unsubstantiated reimbursements.  If there was in fact a misapplication of project funds, the Debtor should bear the fault for same and the resulting shortage of funds to complete the project.  Further, the Plaintiff has failed to prove that Amalgamated's failure to fund the full amount of the loan commitment was caused by anything other than the Debtor's own default of the maturity and completion dates provided for under the Loan Documents.  The Plaintiff has failed to prove any conduct by Amalgamated, outside the parameter of the Loan Documents, that could form a basis for this Court to find that Amalagamated took any action "which [would] have the effect of destroying or injuring the right of the [the Debtor] to receive the fruits of the contract."  Therefore, the Plaintiff's Second Claim for Relief will also be denied.

**E.**        *Fourth Claim for Relief. Unjust enrichment.*

Next, the Plaintiff seeks damages on account of Amalgamated's unjust enrichment at the expense of the Debtor.  Specifically, the Plaintiff argues that Amalgamated was enriched by the work done on the project from July 1, 2009 through October 5, 2009 – which Amalgamated never paid for.  Not only was Amalgamated enriched by the increased value of the project, but the Plaintiff argues it also benefitted because liquidity in the Ultra Fund was freed up by the cessation of funding the Water Street Project.  Finally, the Plaintiff argues that Amalgamated benefited by the bankruptcy process through which Amalgamated was able to retake the property and leave the Debtor's creditors unpaid.

The Plaintiff concedes the well-settled rule in New York that the existence of an express contract between the parties relating to the subject matter of its claim precludes the Plaintiff from maintaining a cause of action for unjust enrichment, *see Strojmaterialintorg v. Russian Am. Commercial Corp.,*, 815 F. Supp. 103, 106 (E.D.N.Y. 1993), but argues that Amalgamated's modifications to the Loan Documents left the contractual rights of the parties unclear and ambiguous, calling into question whether there was an express contract in effect.  *See ADP Investor Commc'n Servs., Inc. v. In House Attorney Servs., Inc.* 390 F. Supp. 2d 212, 222-23 (E.D.N.Y. 2005).

The Court has already found that the contract between the Debtor and Amalgamated was not modified or nullified by the parties' course of dealing and conduct.  Under section 9.2(d) of the BLA, upon an event of default, Amalgamated had no further obligation to advance funds on the project.  In addition, the record is devoid of any evidence that Amalgamated had an obligation to inform the general contractor or subcontractors that it ceased funding and encourage them to stop working.  Although Amalgamated's conduct here may have been

questionable, the Court finds that it is not actionable.  Therefore, the unjust enrichment claim brought against Amalgamated on behalf of the Debtor, will be denied.

### F.        *Fifth Claim for Relief. Declaratory Relief.*

For all the reasons stated earlier in this Decision, the Court denies the Plaintiff's Fifth Claim for Relief which seeks declaratory judgment that the Debtor was not in default of the Loan Documents at the time Amalgamated issued the July 2009 notices of default.  The Court has found that the maturity and completion dates in the Loan Documents were not extended, and thus the Debtor was in default at the time Amalgamated issued the July 2009 notices of default.

## CONCLUSION

For all of the foregoing reasons, judgment will enter in favor of the Defendant on the First, Second, Fourth and Fifth Claims for Relief.  A pre-trial conference with respect to the remaining claims for relief in the Complaint will be held on August 29, 2016 at 1:30 p.m., in Courtroom 860 of the Alfonse M. D'Amato Federal Courthouse, Central Islip, New York.  The Plaintiff's motion to strike and motion *in limine* (Adv. Pro. No. 13-8081, ECF No. 48) will be restored to the calendar on that date.

**Dated: Central Islip, New York**
**July 28, 2016**

_____
**Robert E. Grossman**
**United States Bankruptcy Judge**