UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

EAST END DEVELOPMENT, LLC,

                           Debtor.
------------------------------------------------------------------x
POST-EFFECTIVE DATE COMMITTEE OF THE
ESTATE OF EAST END DEVELOPMENT, LLC,

                         Plaintiff,

v.

AMALGAMATED BANK, as Trustee of
Longview Ultra Construction Loan Investment Fund
f/k/a Longview Ultra I Construction Loan Investment Fund,

                         Defendant.
------------------------------------------------------------------x

Case No. 8-12-76181-reg

Chapter 11

Adv. Proc. No. 13-8081-reg

## <u>DECISION AFTER TRIAL</u>
### (Re: Lender liability and Unjust Enrichment)

       Before the Court is part II of a bifurcated trial in this adversary proceeding.  In its prior

Decision, dated July 28, 2016, this Court found that the Plaintiff failed to sustain its burden of

proof on the First, Second, Fourth and Fifth Claims for Relief which were based on allegations

that the Defendant, Amalgamated Bank ("Defendant" or "Amalgamated"), breached its

contractual obligations to the Debtor, East End Development ("Debtor"), and/or breached non-

contractual obligations to the Debtor in the time preceding the Debtor's default under the loan

agreements.  *See Post-Effective Date Committee v. Amalgamated Bank, as Trustee (In re East*

*End Development, LLC)*, 555 B.R. 138 (Bankr. E.D.N.Y. 2016) ("Prior Decision").  The

remaining causes of action are for "Lender Liability" (Third Claim for Relief), and Unjust

Enrichment (Fourth Claim) as it relates to the post-default time period.[1]  Also remaining is the

Plaintiff's Seventh Claim for Relief which is an Objection to the Defendant's proof of claim.[2]

      The Plaintiff by its Complaint asks the Court in part to hold the Defendant liable for its

conduct despite the fact such conduct has previously been found by this Court not to have

breached the Loan Documents[3] as agreed to by the parties.  The very essence of the Plaintiff's

argument is that a *bona fide* lender can comply with the terms of the loan agreements and still be

liable to a borrower for damages under very specific circumstances.  As a general proposition the

Court concedes that such an outcome is possible under New York law.  However, the

circumstances that would result in such a decision are extraordinary and rare.  The relationship

between a commercial lender and borrower is defined by the loan documents.  The borrower

agrees to assume responsibility and liability for the success of the project.  Unless clearly

defined, this relationship is not a partnership.  The lender is obligated to provide the necessary

capital in an amount and under such terms as the parties agree.  Just as the borrower is permitted,

within the scope of the agreements to protect its investment, so too is a lender permitted to

protect its capital.  Absent extraordinary circumstances courts should not place obligations or

burdens on either party that they have not agreed to assume.

---

[1]     The Defendant objects to the Court's consideration of the Unjust Enrichment claim in this stage of the trial and argues that that claim was fully adjudicated in part I of the trial.  (ECF No. 89).  The Plaintiff responds that the Unjust Enrichment claim was not fully adjudicated in part I of the trial. (ECF No. 90).  The Court will address this issue later in this Decision.

[2]     The Sixth Claim for Relief (Waste and Diminution of Value) was withdrawn by letter, dated November 21, 2016 (ECF No. 83).

[3]     Defined terms not otherwise defined herein will have the meanings ascribed to them in the Prior Decision.

For the reasons set forth herein, the Court finds that the Plaintiff has failed to sustain its burden of proof on the Third and Fourth claims for relief and as such judgment will enter in favor of the Defendant.  For these same reasons, the Objection to Amalgamated's proof of claim will be denied.

## FACTS

The facts set forth in the Court's Previous Decision are incorporated herein by reference. The facts relevant to this Decision focus on the period commencing just prior to the Debtor's default under the Loan Documents in July 2009 through October 2009 at which time work ceased at the project.  A brief summary of the relevant parties is helpful in understanding the facts of this case:  East End Development, LLC, the Debtor, is an entity formed for the purpose of developing a luxury residential condominium project at 21 West Water Street, Sag Harbor, NY (the "Water Street Property" or "Water Street Project").  The Debtor retained RWL4 Construction, Inc. as general contractor for the Water Street Project.  The Debtor also hired Mark D'Andrea as the full-time project manager.  The Defendant, Amalgamated Bank provided the Debtor with the financing to acquire and develop the Water Street Project.  Amalgamated originally retained Construction Management Systems ("CMS") as independent construction consultants, but terminated their services in July 2009 and hired GRS Consulting Group ("GRS").

Construction on the Water Street Project commenced in November 2007.  On July 29 and 30, 2009, Amalgamated issued Notices of Default to the Debtor citing, among other things, completion and payment defaults.  Amalgamated did not give RLW4 or subcontractors notice of these defaults.  Despite the issuance of default notices, on July 31, 2009, Amalgamated funded a

July 20, 2009 payment request (No. 27) in the amount of $1,138,558.27 for work completed through June 30, 2009. Also despite the notices of default, work continued at the project and on September 11, 2009, a payment request, dated August 5, 2009, was submitted to Amalgamated in the amount of $1,551,894.09 for work completed and materials provided during the month of July 2009. Amalgamated did not fund this request, despite the Plaintiff's assertions that there was approximately $4 million available under the loan commitment. Construction ceased on or around October 5, 2009, and on December 4, 2009, the Water Street Project was winterized. (Def's Ex. BB).

Over an extended period of time the Debtor and Amalgamated engaged in negotiations to modify the Loan Documents. These negotiations ultimately failed, and on August 18, 2011, Amalgamated commenced foreclosure proceedings. The Debtor filed an answer and asserted counterclaims against Amalgamated. On October 12, 2012 ("Petition Date") the Debtor filed for chapter 11 bankruptcy relief. As of the Petition Date subcontractors remained unpaid and lien foreclosure actions had been commenced by certain holders of mechanics' liens ("Mechanics' Lien Cases"). By Stipulation and Order, dated January 22, 2013 (Case No. 12-76181, ECF No. 78), the automatic stay was modified to permit the Mechanics' Lien Cases to proceed in state court up to the point of a determination by the state court on the merits.[4]

By Order, entered September 27, 2013, the Court confirmed the Debtor's chapter 11 plan ("Confirmed Plan"). The Order confirming the plan approved the sale of the Water Street Property to Amalgamated via credit bid after no other bids were received. (Case No. 12-76181, ECF No. 172). The Confirmed Plan preserved the Mechanics' Lien Cases and contemplated that those cases would continue in state court. Pursuant to the Confirmed Plan, validly existing

---

[4]    The automatic stay remained in place prohibiting the mechanics' lien claimants from taking any act to collect, assess or recover any claim.

mechanics' lien claims would be paid 100% of their claim, and a reserve fund was established

pending the outcome of the Mechanics' Lien Cases.  (Confirmed Plan ¶¶ 9.2(f)).  If a

subcontractor claim was not determined to be a validly existing mechanics' lien claim, the

claimant would be treated as a general unsecured creditor under the Confirmed Plan and receive

a distribution of approximately 5%.  (Confirmed Plan ¶5.2).  According to Amalgamated, the

mechanics' lienors "have all either stipulated to discontinue their claims in State Court or have

indicated through counsel an intent to do so."  (ECF No. 87, footnote 3).  It appears, therefore,

that any distribution to the unpaid subcontractors relies solely on the outcome of this adversary

proceeding.

## PROCEDURAL HISTORY

The Plaintiff in this case is a committee of subcontractors of RLW4 who were not paid

for their goods and/or services on the Water Street Project.  By Order, dated May 3, 2013, this

Court gave the Plaintiff/committee the authority to commence litigation on behalf of the

Debtor's estate, with the proceeds of such litigation to be distributed pursuant to the Confirmed

Plan and the Order confirming the Plan (Case No. 12-71261, ECF Nos. 128, 172).  The members

of the Plaintiff/committee are All Systems Maintenance, Inc. ("All Systems"), Husbands For

Hire, Inc. d/b/a All Floors and Interiors ("Husbands"), Inter-County Mechanical Corp. ("Inter-

County"), JPR2, Inc. ("JPR2"), and Water Mill Building Supply, Inc. ("Water Mill").

The Plaintiff filed the instant complaint ("Complaint") on May 30, 2013, asserting the

Debtor's claims against Amalgamated for: breach of contract; breach of implied covenant of

good faith and fair dealing; lender liability; unjust enrichment; declaratory relief; waste and

diminution of value; and an objection to claim.

The trial of this matter was bifurcated.  In July 2015, the Court held a trial on the following claims:  Breach of Contract (First Claim for Relief); Breach of Implied Covenant of Good Faith and Fair Dealing (Second Claim for Relief), Unjust Enrichment (Third Claim) and Declaratory Relief (i.e., whether Debtor was in default of the loan documents at the time Amalgamated issued the notice of default in July 2009) (Fifth Claim for Relief).  Part II of the bifurcated trial was held on November 22, 2016.  The entire record of this part of the trial was done by submission of additional exhibits and deposition testimony.  The trial record consists of: the facts and exhibits stipulated to by the Plaintiff and Defendant in the Joint Pretrial Memorandum, dated July 17, 2015, as supplemented (ECF No. 67) consisting of Plaintiff's Exhibits 1 – 97, and Defendant's Exhibits A - MM; testimony of James Freel, Stephen Cerniglia and Leanne Lispi at the first trial; testimony, via deposition, of Emil Talel, Wayne R. Shekailo, Rick Markisoto, and Roy L. Wines, IV, submitted at the first trial; testimony, via deposition, of Frank Spano, Jon Rosenberg, Ron Fuering, Dennis D'Amato, and Anthony Cincotta submitted in connection with part II of the trial.

Post-trial proposed findings of fact and conclusions of law were submitted on January 20, 2017.  (ECF Nos. 86, 87).

## DISCUSSION

### A. *Lender liability*

Although the Third claim for Relief is titled "Lender Liability," the Plaintiff concedes that no such claim is recognized under New York law.  Plaintiff in its post-trial brief relies on cases that have imposed liability on a lender outside of the contract terms under theories of common law breach of fiduciary duty, common law assumption of control, and equitable subordination under 11 U.S.C. §510(c).  Amalgamated argues that the Court should not consider

the breach of fiduciary duty and equitable subordination theories as those claims were never asserted in the Complaint.  The Defendant would have this Court apply an alter ego standard and only impose "lender liability" if the Plaintiff can prove: (1) complete domination of the Debtor by Amalgamated such that the Debtor had no separate will or existence of its own, and (2) such control was used to commit fraud or perpetrate violation of a statutory or other legal duty, and (3) such control was the proximate cause of the injury complained of.

In connection with the Lender Liability claim, the Complaint alleges, among other things, that:

- Amalgamated "has had complete domination of the Debtor . . . with respect to the Sag Harbor Project." (Complaint ¶240).

- "The domination of Amalgamated over the Debtor caused the Debtor to have no separate or independent mind, will or existence of its own . . ." (Complaint ¶241).

- From the July 2009 default to the Petition Date, "[t]he Debtor had no control over what was paid with respect to the Sag Harbor Project. . ." (Complaint ¶244).

- Amalgamated's failure to pay approved requisitions forced "the Debtor to violate its duties with respect to the Mechanics Lienors under the Loan Documents. . .." (Complaint ¶245).

- Amalgamated "utilized its control over the Debtor to leave the Sag Harbor Project dormant for three years while Amalgamated accrued substantial interest, late fees, and attorneys' fees with respect to the Loans. . . ." (Complaint ¶247).

The Court agrees with the Defendant that the "Lender Liability" allegations of the Complaint do not allege or even mention breach of fiduciary duty or equitable subordination, and therefore there is no basis to grant relief on those grounds.  However, the Court will consider the additional theories of lender liability asserted by the Plaintiff in its post-trial brief, and finds that in light of the Court's ruling in Defendant's favor there is no predjudice to Defendant in doing

so.  We will begin our analysis with the legal theory relied upon in the Complaint – the alter ego or instrumentality theory.

### 1.  The Instrumentality and Alter Ego Theories

To impose liability upon a bona fide lender for a borrower's obligations under either the "instrumentality" or "alter ego" theories[5], a plaintiff must prove that: the lender was: (1) in complete domination of finances, policy, and business practices of the borrower in respect to the attacked transaction; (2) the control was used by the lender to commit fraud or perpetuate the violation of a statutory or other positive legal duty; and (3) the control and breach of duty must have proximately caused the injury or unjust loss.  *See Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc),* 277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999) (citing *Fisser v. International Bank*, 282 F.2d 231, 238 (2d Cir. 1960)); *see also Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 438 F.2d 1098 (5th Cir. 1973) (finding defendant-creditor not liable although it was involved in the corporation's financial management and contractual obligations because there was a lack of evidence showing that the corporation had no separate mind, will or existence on its own).

Actual, participatory and total control over the debtor is the level of control necessary under the instrumentality theory or the alter ego theory.  *In re KDI Holdings,* 277 B.R. at 516. The "lender's liability is predicated on an unmistakable showing that the [debtor] in reality has

---

[5]      Although the Court recognizes there may be a distinction between the "instrumentality" and "alter ego" theories, it is a distinction without a difference in this case.  Each theory requires a certain level of control by the lender over the borrower and the Court finds that the Plaintiff did not satisfy its burden of proving a level of control necessary under either theory.  *See R.F.M.A.S., Inc. v. Mimi So*, 619 F.Supp.2d 39, 68 (S.D.N.Y. 2009) (recognizing a distinction between the alter ego theory and the instrumentality theory for piercing the corporate veil actions under Delaware law, although noting it is substantially similar to New York law); *Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 38 (Supr. Ct. Az. 1991) (noting that the instrumentality theory is very similar to, albeit distinct from, the alter ego theory).

no separate, independent existence of its own and was being used to further the purposes of the dominant corporation." *Id.* (citations omitted).  The level of control required is often characterized as total or complete domination.  *National Westminster Bank USA v. Century Healthcare Corporation,* 885 F.Supp. 601, 603 (S.D.N.Y. 1995); *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 438 F.2d 1098 (5th Cir. 1973) (total domination of the subservient corporation is where no separate corporate interests exist and it functions solely for the purposes of the dominant corporation).  The facts must show that the debtor had no separate, independent existence and the lender's dominance was used for its own purposes.  *National Westminster Bank USA,* 885 F.Supp. at 603.

A lender exercising its rights under the parties' loan agreements, without more, does not rise to the level of dominance necessary to impose lender liability.  A lender should not be estopped from taking action when its security is being eroded.  *National Westminster Bank USA,* 885 F.Supp. at 601.  Careful monitoring and suggesting courses of action the debtor should take to improve its financial situation should not and do not amount to the lender's liability.  *Id.* at 603.

For the following reasons, the Court finds that Amalgamated did not exercise a level of control over the Debtor or the Water Street Project such that liability should be imposed under the alter ego or instrumentality theories.  First, as Amalgamated points out, the Debtor was represented at all times by counsel during the post-default period.  Counsel appears to have been retained by the Debtor in workout negotiations with Amalgamated, and was included by Amalgamated on all correspondence in this post-default period.  (Defendant's Supplemental Post-Trial Findings of Fact and Conclusions of Law ("Defendant's Post-Trial Brief"), ECF No. 87, at 22; *see, e.g.*, Def's Ex. P, V, X and EE).  This, coupled with the fact that Amalgamated

ultimately filed foreclosure proceedings against the Debtor, which the Debtor opposed, negates the notion that the Debtor had no separate will or existence separate from Amalgamated.

The Plaintiff also argues that Amalgamated used its control over the Debtor to "leave the Sag Harbor Project dormant for three years while Amalgamated accrued substantial interest, late fees and attorney's fees." (Complaint ¶247). Although it is true that the Water Street Project was dormant for three years, and that it remained dormant because the Debtor lacked the funds to complete the project, the Court does not believe the fact that a borrower cannot complete a project because of inadequate funds translates into a cause of action against the project lender. The Debtor apparently commenced this project undercapitalized and relying entirely on financing by Amalgamated, the terms of which financing were governed by comprehensive Loan Documents signed by the Debtor's principals. (*See* Def's Ex. FF (citing Debtor's refusal to put money into the project to complete); and Def's Ex. L (advising Debtor in April 2009 that the project was out of budget and suggesting, among other things, an equity contribution to cover the shortfall)). The Court previously found that the Debtor *was* in default of the Loan Documents; that the Notices of Default were not improperly issued; Amalgamated was within its rights to cease funding; and Amalgamated had no obligation to advise the Debtor's general contractor or subcontractors that it ceased funding. *See Post-Effective Date Committee v. Amalgamated Bank, as Trustee (In re East End Development, LLC)*, 555 B.R. 138 (Bankr. E.D.N.Y. 2016). The fact that the project was dormant for three years, therefore, is more clearly attributed to the Debtor's default, than to Amalgamated's "control." The Debtor rather than acknowledging the consequences of its own business decisions is seeking, without a factual or legal basis, to transfer liability to Amalgamated.

The Plaintiff also argues that "[t]he Debtor had no control over what was paid with respect to the Sag Harbor Project. . ." (Complaint ¶244).  In one breath, the Plaintiff alleges that the Defendant controlled the project post-default and "the Debtor was no longer directing the Project or any of its workers[,]" and in the next they admit that "[t]he Mechanics['] Lienors testified that upon inquiry as to the status of payment, they were advised by *Mr. Wines and Mark D'Andrea (the Debtor's on-site representative)* that the Defendant was the source of the delays, but that they should keep working because they would be paid in full soon."  (Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, ECF No. 86 ("Plaintiff's Post-Trial Brief"), Compare ¶¶ 86 and 70) (emphasis added).  The record is devoid of any evidence that Amalgamated engaged directly with the Debtor's contractor or subcontractors in any significant way or promised payment for work and did not pay.  The record shows that RLW4 and the Debtor's on-site manager, Mark D'Andrea, were in control of the work performed at the site and were communicating directly with subcontractors.  The Plaintiff asserts that Amalgamated's failure to pay approved requisitions forced "the Debtor to violate its duties with respect to the Mechanics Lienors under the Loan Documents. . .." (Complaint ¶245).  The Plaintiff mentions nothing of the Debtor's "obligation," if one existed, to advise RLW4 and/or the subcontractors that the project was underfunded, and that an extension of the payment and completion deadlines was requested, informally and not in conformity with the Loan Documents, and was never formally extended by Amalgamated.

The improper "control" alleged by the Plaintiff here, and borne out by the evidence presented, amounts to nothing more than a lender exercising its rights under the terms of the loan documents and protecting its position. *National Westminster Bank USA,* 885 F.Supp. at 609

(finding that all business decisions the debtor had made were the result of its inability to pay its debts, rather than the lender utilizing the debtor as its instrumentality).

Although there may be more to this story, the Plaintiff, despite having ample opportunity, has not presented the Court with an evidentiary basis sufficient to establish that Amalgamated exercised complete control over the Debtor with respect to the Water Street Project, or even if it did exercise some degree of control that such control was used to commit a fraud or perpetuate violation of a statutory of other legal duty, or a dishonest act in violation of the Debtor's rights. Lastly, if any damage was caused here the cause of that damage cannot be attributed to Amalgamated. Thus, the Plaintiff has not established the actual, participatory and total control necessary to impose liability on Amalgamated here.

### 2. Breach of fiduciary duty theory

As an alternative for its "lender liability" claim, the Plaintiff argues that Amalgamated owed the Debtor a fiduciary duty because Amalgamated's actions "created a special relationship of confidence and trust." (Plaintiff's Post-Trial Brief, ECF No. 86, ¶¶80-85).   In order to prove a common law breach of fiduciary duty under tort law, a plaintiff must demonstrate: "i) the existence of a fiduciary duty; ii) a knowing breach of that duty, and iii) damages resulting therefrom." *Zorbas v. U.S. Trust Co.,N.A.,* 48 F.Supp.3d 464, 479 (E.D.N.Y. 2014).

First, Plaintiff must prove the existence of a fiduciary relationship between the Debtor and the Defendant. However, a lender-borrower relationship is typically governed by its contractual terms, and it is rare that any fiduciary relationship may arise out of the acts the lender takes pursuant to that contract. *Zorbas v. U.S. Trust Co., N.A.,* 48 F.Supp.3d at 478-80 (collecting cases). Only upon extraordinary circumstances will a fiduciary relationship outside the terms of the underlying contract arise. *Id.* at 480; *see also Mid-Island Hospital, Inc. v.*

*Empire Blue Cross & Blue Shield,* 276 F.3d 123, 130 (2d Cir. 1993) (finding more than an ordinary arms-length commercial relationship was not "extraordinary" enough to establish the lender's fiduciary duty to the borrower); *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir. 1993) (citations omitted); *In re W.T. Grant Co.,* 699 F.2d 599 (2d Cir. 1983) (a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim).

The Plaintiff asks this Court to find that this case presents the rare and extraordinary circumstances necessary to impose a fiduciary obligation between contract parties. Fiduciary relationships can either be express (by contract or express agreement), or implied (based on the relationship between the parties). *Capital Bank v. MVB, Inc.,* 644 So.2d 515, 518 (Court of Appeals Fla. 1994). The latter is implicated here. The Plaintiff argues that a fiduciary duty should be implied because the Defendant: (1) held a position of confidence and trust and enjoyed an unusual advantage over the Debtor such that a "special relationship" was created, or (2) the Defendant "assumed control and responsibility outside the terms" of the contract. *See Zorbas*, 48 F. Supp. 3d 464. When a "special relationship" does exist between a lender and borrower a fiduciary obligation may exist. *Id.*; *see also Capital Bank,* 644 So.2d at 518-519 (collecting cases). If the relationship is based on confidence, trust, superior knowledge or control, a fiduciary relationship may be established. *U.S. Bank National Association v. Ables & Hall Builders*, 696 F.Supp. 2d 428, 442 (S.D.N.Y. 2010) (noting that the fiduciary relationship may arise between a lender-borrower where "a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding or an assumption of control and responsibility"); *Roswell Capital Partners LLC v. Alternative Const. Technologies,* 638 F.Supp.2d 360, 368-69 (S.D.N.Y. 2009) (finding ownership of shares and appointment of

members to the borrower's board is not enough to establish superior knowledge and control to create a special, fiduciary relationship) (citing *Mid-Island Hospital, Inc. v. Empire Blue Cross & Blue Shield,* 276 F.3d 123, 130 (2d Cir. 1993)).  The level of confidence and trust in the bank must rise to the level where the bank enjoys an advantage over other creditors, and assumes control and responsibility.  *Id.*  Courts have gone so far as to say this advantage must be "unusual."  *Zorbas,* 48 F.Supp.3d at 481 (finding the control the lender exercised over the borrower were contemplated by the underlying contract, thus no fiduciary relationship existed). Typically this requires a showing of domination and de facto control on the lender's part.  *Id.* at 480-481.  Or at least that the lender assumed responsibility and control outside the terms of the contract.  *Id.* at 481. "A non-insider creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been a merger of identity."  *Matter of Teltronics Services, Inc.,* 29 B.R. 139 (Bankr. E.D.N.Y. 1983) (interpreting cases establishing a lender's liability based on a fiduciary duty).

### a.  *Whether Amalgamated held a position of trust sufficient to impose a fiduciary duty*

The Plaintiff argues that after the Notice of Default was issued in July 2009, "based upon the unequivocal testimony of the Mechanics' Lienors, there was no doubt that they reasonably believed that the Project was still being funded by the Defendant and Defendant created a special relationship of confidence and trust."  (Plaintiff's Post-Trial Brief, ECF No. 86, ¶81).  The Plaintiff's theory seems to be that the cessation of funding, coupled with Amalgamated's failure to give notice to subcontractors at the project that funding had ceased, coupled with the fact that Amalgamated must have or should have known that work was proceeding at the project, put Amalgamated in a position of trust or created a "special relationship" which created a fiduciary

duty outside of the contract terms.  Plaintiff also places much weight on the fact that in mid-July Amalgamated replaced its on-site construction consultants with a new firm, GRS, and Amalgamated should have known that work was proceeding after July 1, 2009 because Rick Markisoto from GRS was providing regular status updates on the Project.  Amalgamated's knowledge that work was proceeding on the project, the Plaintiff argues, placed Amalgamated in a position of trust in relation to the Debtor, and obligated Amalgamated to inform the Debtor, the general contractor and the subcontractors that it would not pay for work performed after July 1, 2009.

The facts alleged by the Plaintiff do not satisfy the high standard necessary to impose a fiduciary duty on a lender with respect to a borrower.  The record herein demonstrates: (1) Amalgamated issued notices of default on July 29 and 30, 2009 citing events of default dating to July 1, 2009; (2) Amalgamated exercised its rights under the Loan Documents and declined funding a requisition for work that was performed July 1, 2009 through July 29, 2009; and (3) neither Amalgamated nor the Debtor advised subcontractors that they might not be paid for work performed during July 2009.  There are allegations, which the Court does not doubt, that there were extensive negotiations going on between the Debtor and Amalgamated.  Absent from the record are any facts establishing a "special relationship" of trust or confidence between Amalgamated and the Debtor sufficient to impose a fiduciary duty on Amalgamated.

Although the Plaintiff presented extensive testimony by representatives of various unpaid subcontractors, that testimony does not bear out the allegation that Amalgamated's actions placed them in a position of trust or confidence with respect to the Debtor.  That testimony bore out a consistent "story" that the subcontractors had little if any contact with Amalgamated prior to October 2009, but they were aware of and relied on the fact that the project was bank-

financed.  Most, if not all of this reliance, was created by the subcontractors' contact with RLW4

or the Debtor's construction consultant, Mark D'Andrea, not Amalgamated.  *See* Deposition

testimony of Jon Rosenberg, Inter-County Mechanical, dated November 12, 2014, at 26-28;

Deposition testimony of Frank Spano, Inter-County Mechanical, dated November 12, 2014, at

57-58; Deposition testimony of Anthony Cincotta, All Systems Maintenance, dated November

13, 2014, at 40-45; Deposition testimony of Ron Feuring, Husbands for Hire, dated November

13, 2014, at 20-28.[6]   The Plaintiff's subcontractors' testimony simply does not support a finding

of any "special relationship" of trust or confidence between Amalgamated and the Debtor.  *Cf.*

*Capital Bank,* 644 So.2d at 519 (finding "special relationship" where bank officer urged bank

customer to acquire assets of another company; provided faulty appraisals; represented that they

were in business together; and orchestrated an ultimately unfavorable deal with the bank's self

interest in mind).

### b. *Whether Amalgamated asserted control over the Project sufficient to impose a fiduciary duty*

The Plaintiff argues that the Defendant exercised control over the Project by:

(a) Hiring a new agent [GRS] just prior to the Notice of default and having that agent actively report on the Project to the Defendant.

(b) Remaining silent and failing to advise the Debtor's workers to cease work on the Project after the Notice of default.

(c) Not disbursing requisitions by Defendant's own agent from the Unused Reserve account to the Debtor for the benefit of its workers.

---

[6]    Only one subcontractor, it seems, had direct conversations with a representative of Amalgamated. Dennis D'Amato, manager of JPR2, Inc. a framing subcontractor, testified that in the end of July 2009 he spoke to Jim O'Reilly from Amalgamated who promised he would be paid.  (Deposition testimony of Dennis D'Amato, JPR2, dated November 14, 2014, at 36-39).  This testimony of promised payment, however, standing alone is insufficient to place Amalgamated in a position of trust or confidence *with the Debtor*.

     (d) Allowing the Debtor's workers to continue working on the Project knowing it
         was not going to be paid.

(Plaintiff's Post-Trial Brief, ECF No. 86, ¶91).

First, although Plaintiff ascribes some nefarious motive to the substitution of

Amalgamated's construction engineer, this motive is not borne out by any actual evidence.

Hiring an agent and having that agent report on construction progress was entirely consistent

with Amalgamated's rights as lender.  Second, this Court has already found that Amalgamated

was under no duty to advise subcontractors to cease work on the project.  If there was any duty to

notify subcontractors, it would have fallen squarely on the Debtor and/or RLW4, not the lender,

and therefore "allowing" the Debtor's workers to continue work on the project does not equate to

Amalgamated exercising control at the project.  Third, the Court has also found that

Amalgamated was under no duty to fund any part of the commitment amount after an Event of

Default.  Control over the funding does not equate to control over the project.  None of the

actions complained of by Plaintiff fall outside the parameters of what Amalgamated was

permitted to do under the Loan Documents, and thus should not be used to establish improper

control by the lender to create lender liability.

Perhaps the most persuasive evidence weighing *against* a finding for the Plaintiff on this

issue of "control" over the Project comes from Plaintiff's supplemental exhibits.  First, an email

written by Mark D'Andrea to Roy Wines, principal of RLW4. (Pl's Ex. 95).  In response to Mr.

Wines's inquiry about the status of payment on the requisition, Mr. D'Andrea, on July 27, 2009

(2 days before the Notice of Default) wrote: "The trades must contact me that are seeking

payment. ***I'm in charge of this project and I will not succumb to threats from the trades.***  If

equipment is not lifted on time, I will replace the trade in question!"  (Pl's Ex. 95 (emphasis

added)).  Second, it appears that in September 2009, Mr. D'Andrea was still engaged in the project on the Debtor's behalf.  On September 21, 2009, he wrote to Mr. Wines: "I have spoken to all parties involved in the current draw.  The bank is in a transitional phase. . . .  Please keep the trades informed. I will have some solid answers any day now. . . . I can assure you and the trades that the draw is fourth [sic] coming."  (Pl's Ex. 95).   Finally, an email from Roy Wines to All Systems Maintenance shows that the Debtor and its general contractor were in control of the project site in May 2010.  Mr. Wines wrote on May 21, 2010, that "Anyone who needs to gain access to the building or who must come on the site, **MUST** make arrangements and will be supervised by someone from RLW4 Construction, Inc. and/or East End Development, LLC. (Pl's Ex. 97) (emphasis in original).  These emails negate any finding that Amalgamated was in control of the Water Street Project during the time period complained of by the Plaintiff.

The evidence presented to the Court requires a finding that Amalgamated's conduct did not give rise to a special relationship sufficient to hold Amalgamated in a position of trust and confidence with the Debtor.  Nor did the Plaintiff present facts sufficient to find that Amalgamated exercised control over the Debtor or over the Water Street Project outside of the contract terms sufficient to impose any extraordinary duties upon Amalgamated outside of the contract terms.[7]

---

[7] Although the Plaintiff does not explicitly assert a separate agency theory, it does cite *A Gay Jenson Farms Co. v. Cargill, Inc.* 309 N.W.2d 285 (Minn. 1981), for the proposition that a lender may be held liable for the borrower's financial obligations if the level of control necessary to establish an agency relationship is proven.  *A Gay Jenson Farms Co. v. Cargill, Inc.* 309 N.W.2d 285 (Minn. 1981) (holding the lender liable to the borrower's other creditors because the borrower was acting for the benefit of the lender, and the lender had sufficient influence and control over the borrower's operations).  Because the Court finds that Amalagmated did not exercise control over the Debtor outside of the bounds of what was permitted under the Loan Documents, this agency theory also fails.

3.  **Equitable Subordination Theory**

Along with the common law causes of action, Plaintiff argues that because of the

Defendant's conduct, equitable subordination under 11 U.S.C. §510(c) is warranted.  Section

510(c) provides that the Court may "(1) under principles of equitable subordination, subordinate

for purposes of distribution all or part of an allowed claim to all or part of another allowed claim

. . . ; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

11 U.S.C. §510(c).  This section codified the Bankruptcy Court's equitable powers as found in

*Pepper v. Litton,* to subordinate creditors notwithstanding their previously established priority on

the debtor's assets.  11 U.S.C. §510(c); *Pepper v. Litton,* 308 U.S. 295 (1939).  The standard to

prove equitable subordination was settled in *Pepper v. Litton,* requiring:

1)  the claimant engaged in inequitable conduct
2)  the misconduct caused injury to a creditor
3)  and equitable subordination is not inconsistent with the Code.

11 U.S.C. §510(c); *see also Matter of Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977).  Equitable

subordination is an extraordinary remedy and the above cited conditions must be satisfied.

*Matter of Teltronics Services, Inc.,* 29 B.R. 139 (Bankr. E.D.N.Y. 1983) (citing *Pepper v. Litton*

and *Matter of Mobile Steel Co.*).  If a bankruptcy court finds that the claimant has at the very

least violated the rules of "fair play and good conscience" it may subordinate its claim to other's

in the bankruptcy proceedings.  *Id.* at 168.

Plaintiff advances many of the same arguments to support equitable subordination that it

utilized in support of its "lender liability" claim, and asserts that equitable subordination is a

"byproduct of lender liability and fiduciary duty and is used to obtain the fair result."  (Plaintiff's

Post-Trial Brief, ECF No. 86, ¶96).  Amalgamated objects to the Court's consideration of the

equitable subordination claim due to Plaintiff's failure to allege a cause of action for same in the

Complaint; but also argues that this Court has already allowed the members of the

Plaintiff/committee the opportunity to pursue subordination of Amalgamated's security interest when it lifted the stay by Stipulation and Order dated January 22, 2013, permitting some or all of the members of the Plaintiff/committee to pursue the Mechanics' Lien Cases in Suffolk County State Court.[8]

The Court agrees with Amalgamated.  First, Plaintiff did not allege a claim for equitable subordination in the Complaint, and it would be inappropriate for the Court to grant such relief to Plaintiff on claims that were not alleged in the Complaint.  Second, the Confirmed Plan speaks to this issue of subordination and contemplates that the Mechanics' Lien Cases would continue in state court to resolution, and if successful would result in the elevation of the Mechanics' Lienor claims over Amalgamated's claims.  Pursuant to the Confirmed Plan, validly existing mechanics' lien claims would be paid 100% of their claim, and a reserve fund was established pending the outcome of the Mechanics' Lien Cases.  (Confirmed Plan ¶¶ 9.2(f)).  If a subcontractor claim was not determined to be a validly existing mechanics' lien claim, the claimant would be treated as a general unsecured creditor under the Confirmed Plan and receive a distribution of approximately 5%.  (Confirmed Plan ¶5.2).  According to Amalgamated, the mechanics' lienors "have all either already stipulated to discontinue their claims in State Court or have indicated through counsel an intent to do so."  (Defendant's Post-Trial Brief, ECF No. 87, footnote 3).  It appears, therefore, that the mechanics' lienholders' priority (or lack of priority) over Amalgamated was addressed by the Confirmed Plan, and that alone may be considered the "law of the case" on the subject of subordination.  (Confirmed Plan ¶ 5.4).   However, even if this Court were to consider the equitable subordination claim on the merits, the Court finds that the

---

[8]       Based on Amalgamated's representation, it appears that the mechanics' lienors may have abandoned their state claims against Amalgamated.

facts presented, for all of the reasons already discussed, do not satisfy the standard for equitable subordination as set forth in *Pepper v. Litton*.

### B. *Unjust enrichment*

As a preliminary matter, the Court must determine whether the Unjust Enrichment claim should be considered in this second phase of the case.  Amalgamated argues that the Unjust Enrichment claim was fully adjudicated in this Court's Previous Decision, and should not be further considered.  (ECF. No. 89).  The Plaintiff contends that the Court's prior ruling on unjust enrichment "is properly construed as being limited to the Plaintiff's claims relating to the work, labor, and services rendered to the Defendant during the post-default period (after July 30, 2009)."  (Plaintiff's Post-Trial Brief, ECF No. 86, ¶99).  In this second phase, the Plaintiff is asking the Court to rule on the unjust enrichment claim as it relates to work performed at the project from July 1, 2009 (post-default, pre-Notice of Default) to July 29, 2009 (Notice of Default) (approximately $1,552,388.82), for which Amalgamated did not pay.  The Plaintiff argues that the time period of July 1, 2009 – July 29, 2009 is distinct because the "Defendant argued that the Notice of Default, even though issued on July 30, 2009, terminated the Debtor's contractors on June 30, 2009, the date by which the project should have been completed." (Plaintiff's Post-Trial Brief, ECF No. 86, ¶99).

Consistent with the presentation of the claim in Plaintiff's first post-trial brief, it was the Court's intention that its prior ruling on the unjust enrichment claim encompass the time period July 1, 2009 through October 5, 2009.  (Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, ECF No. 74, ¶180 ("Here, the record demonstrates that the Defendant was enriched by the work completed on the Project between July 1, 2009 and October 5, 2009.").

Even if the Court were to carve out July 1, 2009 through July 30, 2009 from its Previous Decision, the Court disagrees with the Plaintiff that there is any legally significant distinction between the pre-Notice of Default and post-Notice of Default time periods as it relates to the unjust enrichment claim.  In order to rule in the Plaintiff's favor, the Court must find that Amalgamated was enriched at the Debtor's expense, and also find that "equity and good conscience" dictate that Amalgamated compensate the Debtor's estate in the amount of $1,552,388.82 (the value of work performed during the month of July 2009).[9]

In its Prior Decision on the Unjust Enrichment claim, this Court found that a valid and binding agreement existed between the Debtor and Amalgamated which dictated the rights and liabilities of the parties.  "Under section 9.2(d) of the BLA, ***upon an event of default***, Amalgamated had no further obligation to advance funds on the project."  *See East End Development*, 555 B.R. at 159 (emphasis added).  The provision is triggered by the *event* of default, not the notice of default.  And as previously stated, the record is devoid of any evidence that Amalgamated had an obligation to inform the general contractor or subcontractors that an event of default existed and encourage them to stop working.  The Debtor knew or should have known that an event of default existed when it failed to meet payment and completion deadlines.

During the month of July, and beyond, it appears that the Debtor and Amalgamated engaged in negotiations which no doubt the Debtor hoped would result in continued funding and ultimate completion of the project all to its financial gain.  (*See, e.g.*, Def's Ex. FF and GG). However, the work proceeded not at the specific behest of Amalgamated, but at the Debtor's,

---

[9]    To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182 (2011) (citations, alterations, and internal quotation marks omitted).  The essential inquiry "is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 421 (1972).

and the Debtor proceeded at its peril that funds from Amalgamated would not be forthcoming to pay for work performed during that period. Therefore, the facts and evidence presented by the Plaintiff do not convince the Court that "equity and good conscience" dictate that Amalgamated be held liable for work performed at the Water Street Project either prior to or after the issuance of the Notice of Default.

### C. Objection to Claim

For all of the reasons already stated, the Court denies Plaintiff's objection to Amalgamated's claim in this bankruptcy case and finds that the "significant accrual of interest, late fees, and attorneys' fees subsequent to the July 2009 Default" (Complaint ¶277) was not the result of Amalgamated's bad acts.

### CONCLUSION

For the reasons stated herein, and in the Prior Decision, judgment will enter in favor of the Defendant on each of the causes of action alleged in the Complaint.



**Dated: Central Islip, New York**
   **April 4, 2017**

          **Robert E. Grossman**
         **United States Bankruptcy Judge**